# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 09-293V
**Filed: September 1, 2015**
[TO BE PUBLISHED]

```
* * * * * * * * * * * * * * * * * *
RACHEL MCCULLOCH,                *
as parent and legal guardian of A.M.,  *
                                 *
                                 *
              Petitioner,        *      Interim Attorneys' Fees and Costs;
                                 *      Forum Hourly Rate; Boston Local Rate.
      v.                         *
                                 *
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *
                                 *
              Respondent.        *
* * * * * * * * * * * * * * * * * *
```

<u>Ronald C. Homer</u>, Conway, Homer & Chin-Caplan, P.C., Boston, MA, for petitioner.
<u>Debra A. Filteau Begley</u>, United States Department of Justice, Washington, DC, for respondent.

## <u>DECISION ON INTERIM ATTORNEYS' FEES AND COSTS[1]</u>

**Gowen**, Special Master:

On May 11, 2009, Rachel McCulloch ("petitioner") filed a petition on behalf of her minor daughter ("A.M." or "minor child") for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 – 34 (2012)[2] (the "Vaccine Act" or "the Program"). Petitioner alleged that as a result of receiving a Human Papillomavirus vaccine ("HPV" or "Gardasil") on August 16, 2007, her minor child developed a severe neurological injury. On December 7, 2009, petitioner filed an Amended Petition alleging that the HPV vaccine caused the

---

[1] Because this published ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002).  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

minor child to develop encephalitis, intractable epilepsy, and subsequent developmental delays. See Amended Petition at Preamble.

A ruling on entitlement was issued on May 22, 2015, after a two-day hearing and extensive post-trial briefing by both parties. I rendered a decision finding that the petitioner was entitled to compensation for A.M.'s injuries. No damages award has been issued yet.

On March 18, 2015, petitioner filed a Motion for Interim Attorneys' Fees and Costs with a supporting memorandum ("Pet. Motion"). Petitioner requests $156,343.60 for attorneys' fees, $75,860.52 for costs, and $250.00 in costs personally incurred by the petitioner, Rachel McCulloch. See Pet. Motion at 1. Petitioner filed detailed time sheets and invoices in support of her motion. See generally Pet. Motion Tab A at 4-133. Petitioner also requests that I determine appropriate 2014 and 2015 hourly rates for Conway Homer & Chin-Caplan ("CHC") attorneys, law clerks, and paralegals, as petitioner and respondent are no longer operating under the fee agreement reached in *Carr v. Secy' of HHS*, No. 00-778V, 2006 WL 1073032 (Fed. Cl. Spec. Mstr. Mar. 29, 2006). See Pet. Memorandum for Interim Attorneys' Fees and Costs ("Pet. Memo") at 2. Petitioner argues that CHC is entitled to forum rates of Washington, D.C. Id.

On May 12, 2015, respondent filed a response opposing petitioner's motion for interim attorneys' fees and costs, "on the grounds that (1) an award of interim attorneys' fees and costs are [sic] not appropriate at this time, (2) the attorneys' hourly rates sought for the period of March 31, 2014 to the present are not reasonable, and (3) portions of the time expended by [petitioner's] counsel are excessive and/or unreasonable." Respondent's Opposition to Petitioner's Application for Attorneys' Fees and Costs ("Resp. Response") at 1. Respondent suggests that the petitioner's attorneys' fees be reduced by $77,892.60, and costs reduced by $1,857.00. See Resp. Response at 40-41. Respondent does not object to awarding $250.00 for costs expended by Rachel McCulloch.

On June 5, 2015, petitioner filed a reply in further support of her interim fee and cost requests. Petitioner argues that an award of interim attorneys' fees and costs is appropriate under *Avera* where, as in this case, the fees and costs are substantial and an award will prevent undue hardship. See Pet. Reply at 4-5 (citing *Avera*, 515 F.3d 1343, 1352 (Fed. Cir. 2008)). Petitioner further argues that the forum rates sought by counsel at CHC are reasonable as there is no significant difference between the local Boston hourly rate and the Washington D.C. forum rate. Id. at 7-10. With regard to the respondent's objections to portions of time spent by CHC on this case, petitioner argues for compensation for all their time, and further argues for compensation for all costs.

Petitioner filed a supplemental fee request on June 5, 2015 in the amount of $16,752.00 for preparing a reply to respondent's response. See Pet. Supp. Motion for Interim Attorneys' Fees and Costs ("Pet. Supp. Motion") at 1. On June 26, 2015, respondent filed a response to petitioner's supplemental fees motion and a sur-reply to petitioner's reply. Respondent maintained her position as indicated in her response, with the added argument that, based on recent forum rate decisions by Special Masters, all attorneys at CHC (and not just the partners as respondent initially argued in her response) should be awarded local rates because she contends there is a significant difference between forum and local rates based on her suggested forum and local rates for CHC. See Sur-Reply at 2-3. Respondent further argued that the rates under *Carr* are not supported by law or any evidence, and that those rates have "provided a windfall to CHC" over the years. Id. at 4-6.

During a telephonic status conference on the issue of petitioner's interim fees and costs request on June 17, 2015, the parties indicated that they would like a decision on the record without a hearing or mediation. Accordingly, this matter is now ripe for a decision.

For the reasons set forth below, petitioner is awarded **$165,326.60** for interim attorneys' fees and **$74,183.52** for interim costs incurred up to and including June 5, 2015. Petitioner is also awarded **$250.00** for costs personally incurred, pursuant to General Order No. 9.

## I.      BACKGROUND

### A. Procedural History and Background of the Petition for Vaccine Program Compensation

This case was filed on May 11, 2009, and assigned to then-Chief Special Master Golkiewicz. In the eight months following the filing of the petition, petitioner filed extensive medical records detailing A.M.'s diagnosis and treatment of "encephalitis of unknown origin." See Pet. Exhibit ("Ex.") 1-20, 23.

Petitioner filed an Amended Petition on December 7, 2009, alleging that the HPV vaccine caused petitioner to develop encephalitis, intractable epilepsy, and developmental delay. See Amended Petition at Preamble.  On March 9, 2010, respondent filed her Rule 4(c) Report against compensation under the Vaccine Act asserting petitioner had not produced any medical or scientific explanation of her claim sufficient to establish causation. Resp. Rule 4 at 10-11, docket no. 25, filed Mar. 9, 2010.  Respondent further argued that none of A.M.'s treating physicians linked her condition to the HPV vaccination. Id. Accordingly, on April 8, 2010, petitioner was ordered to file an expert report addressing the *Althen* criteria. See *Althen v. Sec'y of HHS*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Petitioner filed a motion to stay the proceedings on September 7, 2010, stating that the medical literature and scientific evidence at that time did not adequately address the safety of the HPV vaccine, and that additional time was therefore needed "to allow the science surrounding the [HPV vaccine] to develop." Pet. Mot. to Stay Proceedings at 8.  On October 7, 2010, respondent filed a response to petitioner's motion arguing against an indefinite stay of the proceedings. Resp. Response to Motion to Stay at 4. After holding a status conference on November 23, 2010, Chief Special Master Golkiewicz granted petitioner ninety days to file an expert report. Petitioner subsequently filed an expert report from Dr. Svetlana Blitshteyn, along with several exhibits of medical literature in support of the opinion on February 22, 2011. See Pet. Ex. 25-26.

The case was reassigned to Special Master Zane on March 16, 2011. Thereafter, respondent filed a responsive expert report along with medical literature from Dr. John Sladky on April 22, 2011. See Resp. Ex. A-G.  Petitioner filed a supplemental expert report from Dr. Blitshteyn on August 16, 2011. See Pet. Ex. 27. Respondent filed a supplemental amended expert report from Dr. Arun Venkatesan on November 21, 2011. See Resp. Ex. H. Petitioner filed a supplemental report from Dr. Lawrence Steinman on October 10, 2012. See Pet. Ex. 34. Respondent filed a responsive supplemental expert report from Dr. Venkatesan on March 25, 2013. See Resp. Ex.

Q-R.

After the parties indicated a willingness to engage in settlement discussions, Special Master Zane ordered periodic status reports on the progress of settlement discussions beginning on July 15, 2013. Chief Special Master Vowell was assigned this case on September 6, 2013. After several months of settlement negotiations, the parties filed a joint status report on December 20, 2013 stating settlement was not feasible. See Joint Status Report filed December 20, 2013.

Thereafter, I was assigned to this case on March 4, 2014 and an entitlement hearing was held on April 10 and 11, 2014. After extensive post hearing briefing by both parties, a decision finding that the petitioner was entitled to compensation for A.M.'s injury was entered on May 22, 2015.

## B. Background of the Fee Dispute

Some background information is useful to the understanding of the issues presented in this matter.  The firm of CHC, located in Boston, Massachusetts, has long been one of the most active firms in the representation of petitioners in the Vaccine Program. See Pet. Memo at 1. In fact, the firm's practice is limited to Vaccine Act cases. Id. at 2. Because of CHC's significant participation in the Program, and in order to avoid unnecessary litigation over hourly rates, the parties reached an agreement as to rates for CHC cases in 2006. At the request of the parties, former Chief Special Master Gary Golkiewicz entered a decision in *Carr v. Sec'y of HHS*, setting forth the agreement between the parties on hourly rates for CHC attorneys and paralegals based upon prevailing rates for the Boston area. See *Carr v. Sec'y of HHS*, No. 00-778V, 2006 WL10730321, at *1-*4 (Fed. Cl. Spec. Mstr. Mar. 29, 2006).  This decision was entered at the request of the parties after extensive discussion and similar briefing of their disagreement on appropriate hourly rates. See generally id.

*Carr* set forth rates in 2006 for Kevin Conway ($300), Sylvia Chin-Caplan ($270), Ronald Homer ($260), and firm paralegals at $95 per hour. Id. at *3.  The parties further agreed that the rates in the agreement (hereinafter referred to as "*Carr* rates") would increase in specific annual increments until the remaining two partners, Sylvia Chin-Caplan and Ronald Homer were billing at $300 an hour. Id. Thereafter rates for Sylvia Chin-Caplan and Ronald Homer would be increased in accordance with the annual rate of increase in the Consumer Price Index ("CPI"). Id.  The rates for partner Kevin Conway and firm paralegals would also be adjusted after 2006 consistent with the CPI. Id. The parties generally operated under that agreement through March 2014, as petitioners represented by CHC submitted fee requests with the agreed upon hourly rates, to which respondent generally did not object. Specifically, as to this case, CHC submitted billings under the *Carr* rate for all activity prior to March 2014, and billed at their newly proposed hourly rates for activity after March 2014 up to June 5, 2015, when their supplemental fees request was filed. See Pet. Motion Tab A at 4-133.

As noted by former Chief Special Master Golkiewicz, the precedential value of his decision in *Carr* was "restricted to the named attorneys and paralegals of CHC, and other vaccine lawyers practicing in the relevant community of Boston." *Carr*, 2006 WL 1073032 at *2. Furthermore, the agreed upon rates and methodology for calculating those rates were to be used for the "time periods indicated," namely, from 2006 and thereafter, with annual CPI adjustments. Id.  While the *Carr*

4

agreement did not have a specific expiration date, after nine years, CHC is requesting that the agreement be reviewed in light of more recent fee decisions involving other counsel, and in light of the *Avera* decision from the Federal Circuit indicating that the forum rate for Washington D.C. should be utilized in fee decisions unless the locality where the bulk of the case work is performed has a "very significant[ly]" lower rate than the forum rate (the "*Davis* exception"). *Avera*, 515 F.3d at 1348 (citing *Davis Cnty. Solid Waste Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency*, 169 F.3d 755, 758 (D.C. Cir. 1999)). Petitioner here is seeking an upward adjustment from the *Carr* rates— ranging from 20 to 45 percent— for different members of the CHC firm. See generally Pet. Memo.

In her response, respondent initially contended that comparable attorneys' fee rates in Boston are 52 percent less than in Washington D.C. at the partner level and approximately 27 percent less at the associate level. Resp. Response at 12. Thus, according to respondent, the *Davis* exception to the forum rule should apply to the partners, all of whom have more than 20 years of experience as attorneys, because the partner rates in Boston are significantly less than they are in Washington D.C. Resp. Response at 17 (citing the *Davis* exception as applied in *Hall v. Sec'y of HHS*, No. 02-1052V, 2010 WL 1840837, at *10 (Fed. Cl. Spec. Mstr. May 5, 2010)) (internal citations omitted). The respondent initially contended that the associates, all of whom have less than 10 years of experience, should receive the Washington D.C. forum rate as she stated the *Davis* exception does not apply when there is a 27 percent difference between the local rate and forum rate. However, as stated in her sur-reply, respondent now contends that based on recent Vaccine Program forum rate decisions in *O'Neil*,[3] *Barrett*,[4] and *Scharfenberger*,[5] all of which awarded higher rates for attorneys with 10 or less years of experience, the *Davis* exception should apply to CHC associates as well because there is a now a "very significant difference" of 57 percent between the forum and suggested local rates. See Sur-Reply at 2-3. The respondent also proposes a significant downward adjustment in the *Carr* rates for CHC, ranging from 25 to 29 percent— contending not only that an upward adjustment of the 2014-15 rates based on the CPI is not justified, but also that the *Carr* rates over the years have provided a "windfall" for CHC. See Sur-Reply at 4-5.

On June 17, 2015, I held a recorded status conference in which Kevin Conway, Ronald Homer and Joseph Pepper participated for the petitioner, and Debra Begley, Catherine Reeves, Voris Johnson, and Darryl Wishard participated on behalf of the respondent. See Transcript, docket no. 141, June 25, 2015. During the status conference, Mr. Homer emphasized the need for a timely decision on this issue as all the firm's fee applications were now being litigated and thus may potentially affect the firm's ability to retain necessary experts for ongoing cases. Id. Respondent's counsel, Ms. Begley, indicated the respondent believed it had thoroughly set forth her objections to CHC's proposed hourly rates and fee request based on her interpretation of the evidence to support a forum versus local rate. The parties were offered the opportunity to engage in mediation or to have a hearing on this issue. Id. Both parties elected to proceed to a decision on

---

[3] *O'Neil v. Sec'y of HHS*, No. 08-243V, 2015 WL 2399211, at *7 (Fed. Cl. Spec. Mstr. Apr. 28, 2015).

[4] *Barrett v. Sec'y of HHS*, No. 09-389V, 2014 WL 2505689, at *13 (Fed. Cl. Spec. Mstr. May 13, 2014).

[5] *Scharfengerger v. Sec'y of HHS*, No. 11-221V, 2015 WL 3526559, at *10 (Fed. Cl. Spec. Mstr. May 15, 2015).

the record. Id.

## II.     ANALYSIS

### A.  Legal Standard

Interim fee awards are permissible under the Vaccine Act. See *Avera*, 515 F.3d at 1352; see also *Shaw v. Sec'y of HHS*, 609 F.3d 1372 (Fed. Cir. 2010). In *Avera*, the Federal Circuit noted that "interim fees are particularly appropriate in cases where proceedings are protracted and costly experts must be retained." *Avera*, 515 F.3d at 1352. The court reasoned that when the amount of fees and costs is substantial, and/or there is a delay in an award, interim fees are appropriate to prevent undue hardship. Id. This reasoning was extended in *Shaw* when the Federal Circuit held that "where the claimant establishes that the cost of litigation has imposed an undue hardship and there exists a good faith basis for the claim, it is proper for the special master to award interim attorneys' fees." *Shaw v. Sec'y of HHS*, 609 F.3d 1372, 1375 (Fed. Cir. 2010).

The Federal Circuit in *Avera* noted, "[o]ne of the underlying purposes of the Vaccine Act was to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims." *Avera*, 515 F.3d at 1352 (citing *Saunders v. Sec'y of HHS*, 25 F.3d 1031, 1035 (Fed. Cir. 1994)). "Denying interim fee awards would clearly make it more difficult for claimants to secure competent counsel because delaying payments decreases the effective value of awards." Id.

Post-*Avera*, a number of judges and many special masters have found interim fee awards permissible under various circumstances, including when petitioner's counsel withdraws from the case. See, e.g., *Woods v. Sec'y of HHS*, 105 Fed. Cl. 148, 154 (Fed. Cl. 2012) (Judge Williams affirmed the special master's award of interim fees and suggested that when counsel withdraws, and it is unknowable how long case resolution might take, an interim award may be appropriate); *Dobrydnev v. Sec'y of HHS*, 94 Fed. Cl. 134, 148 (2010) rev'd on other grounds, 98 Fed. Cl. 190 (2011) (Judge Braden held that a denial of petitioner's request for interim fees for an expert witness was prejudicial where the expert represented that he would not participate in further proceedings without payment of outstanding bills petitioners could not pay); *Nuttall v. Sec'y of HHS*, No. 07-810, 2011 WL 5926131, at *2 (Fed. Cl. Spec. Mstr. Nov. 4, 2011) (Special Master Moran found that interim fees were appropriate as the case had been pending for approximately four years); *Hirmiz v. Sec'y of HHS*, No. 06-371, 2011 WL 2680721, at *4 (Fed. Cl. Spec. Mstr. June 13, 2011) (Special Master Hastings cited seventeen special master decisions granting interim fees in cases where judgment on the merits had yet to be granted, and also found that the circumstances of the case at hand warranted an award of fees in part because it seemed likely that it would be a long time before a final decision would be rendered and that petitioner needed funds to obtain an expert opinion).

Nevertheless, petitioner "bears the burden of establishing the hours expended" and the reasonableness of the requested fee award. *Wasson v. Sec'y of HHS*, 24 Cl. Ct. 482, 484 (1991), aff'd in relevant part, 988 F.2d 131 (Fed. Cir. 1993) (per curiam). A special master has "wide discretion in determining the reasonableness" of attorneys' fees and costs. *Perreira v. Sec'y of HHS*, 27 Fed. Cl. 29, 34 (1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Reasonable attorneys' fees are determined by applying the lodestar method. *Avera*, 515 F.3d at 1347-48 (quoting *Blum v.*

*Stenson*, 465 U.S. 886, 888 (1984)). Under this method, the special master first determines an "initial estimate [of fees] . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. Then, the special master may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348. Additionally, the requirement that attorneys' fees be reasonable also applies to costs. *Perreira*, 27 Fed. Cl. at 34 ("Not only must any request for attorneys' fees be reasonable, so must any request for reimbursement of costs.").

In making reductions, a line-by-line evaluation of the fee application is not required. *Wasson*, 24 Cl. Ct. at 484. Special masters may rely on their experience with the Vaccine Act and its attorneys to determine the reasonable number of hours expended. Id. Just as "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorneys' fee requests . . . [v]accine program special masters are also entitled to use their prior experience in reviewing fee applications." *Saxton v. Sec'y of HHS*, 3 F.3d 1517, 1521 (Fed. Cir. 1993).

## B. Interim Fee and Cost Award

Interim fees may be paid at the discretion of the special master. While they are not routinely awarded, interim fees may be awarded where the case has been proceeding for a significant amount of time, where the fees and costs are substantial, or where a hardship would be created by not awarding interim fees. *Avera*, 515 F.3d at 1352.

Petitioner argues that proceedings in the instant case "ha[ve] been extensive, costly experts have been retained (costs are $75,860.52), and the requested fees ($156,343.60) are substantial." Pet. Reply at 4. Respondent argues that hardship under *Avera* refers specifically to a petitioner's hardship and not that of their counsel, and that "to the extent the circumstances of counsel are relevant, . . . [CHC] has received over $21,500,000.00 in fees and costs paid by the Program since 2007," and "that it would be disingenuous for [CHC] to assert that it would suffer financial hardship if it were required to wait until this case is concluded to receive an award of fees and costs." Resp. Response at 4 (citing *Avera*, 515 F.3d at 1352 for the proposition that the "undue hardship" requirement applies only to petitioners and not their counsel).

The respondent provided a chart showing the amount of fees earned by the CHC firm since 2007 to support her argument that CHC has no hardship and that in fact it has received a windfall under the *Carr* rates. Respondent contended that CHC has handled 9.7 percent of the cases (350 cases) filed in the Program since 2007 and received 18.24 percent of the fees and costs paid. Resp. Response at 8-9. CHC vigorously contested this argument on several grounds. First, CHC correctly noted that all of its fees were approved by a special master, generally after input from the respondent. Pet. Sur-Reply to Resp. Reply ("Pet. Sur-Reply") at 21. Second, the $21.5 million figure cited by the respondent failed to exclude costs and fees paid to persons outside the CHC firm, such as fees paid to referring attorneys. According to petitioner's counsel, the costs amounted to $3.7 million and fees paid to other attorneys amounted to $1.2 million. Id. at 22-23.[6] Third, and most importantly, the fees paid to CHC reflected payment for 1100 cases handled, most of which

---

[6] Respondent's Response to Petitioner's Reply at page 6 acknowledges that the data and evidence relied upon by respondent does not makes the distinction between attorneys' fees and costs.

were filed before 2007, not the 350 cases filed since that time as respondent asserts.[7] Id. at 22; Pet. Reply at 23 n. 3 (according to CHC, as of the time of filing of respondent's objections in this matter, no fee has been paid on 117 of the 350 cases respondent references). Petitioner submits that it has received approximately $7.4 million in fees for cases filed since 2007, much less than the $21.5 million suggested by respondent. Id.

In considering the parties' arguments, I find that when the divisor is changed from 350 cases to 1100, and costs subtracted from $21.5 million, the suggested disproportion between fees earned and cases litigated disappears. In fact, considering only the actual amount of fees CHC received ($7.4 million), it appears CHC received 6.3 percent of the fees paid in the Program for cases filed since 2007, not 18.24 percent. In a different view, when the total amount of attorneys' fees and costs paid by the Program since 2007 is considered, (approximately $117.9 million), and compared directly to the amount CHC actually received in cases filed since 2007 for attorneys' fees for both the firm and for outside attorneys ($8.6 million) and including the amount CHC received in costs ($3.7 million) (total $12.3 million), the percentage of total fees and costs paid to CHC is 10.4 percent, and not 18.24 percent.[8]  Obviously, this number is much more in line with the total number of cases filed since 2007.

Whether or not respondent intended to exaggerate the extent of fees received in order to suggest a windfall, the effect of the argument was in fact misleading and needlessly so. The argument is unpersuasive for other reasons as well. A statistic merely comparing the total amount of fees to the number of cases handled fails to account for the complexity of the cases handled and the extent of the defenses raised by the respondent.  As the parties well know, the volume of work required in vaccine cases varies dramatically based upon complexity.  Fees for cases which are conceded or stipulated at an early time in the litigation generate far lower fees than cases that proceed through expert analyses, literature submissions, briefings, and hearings. Comparative hourly rate data derived from other Vaccine Program cases, as will be discussed below, suggests that the CHC firm has not received rates in excess of other attorneys in the Program, and that the extent of fees earned is more reflective of the volume of work performed.

Moreover, the amount of fees and costs CHC has received in this Program since 2007 is irrelevant to whether CHC is entitled to interim attorneys' fees and costs in *this* specific matter— a matter in which substantial costs have been incurred and considerable time expended over the eight years since petitioner sought counsel from CHC in June 2008. CHC has been representing petitioner in the litigation of this case since May 2009. The issues involved in the entitlement

---

[7] Respondent's opposition to petitioner's application for interim attorneys' fees and costs states:

> Further, according to statistics published on HHS's website, there were 3595 petitions filed between FY 2007 and FY 2014. According to a data search of the court's CM/ECF system, CHCC filed 350 cases between FY 2007 and FY 2014 or about 9.7% of the total number of petitions filed.  Thus, although CHCC filed only about 9.7% of the Program's petitions, CHCC was awarded about 18.24% of all fees and costs in the program. Resp. Response at 10.

[8] This number is derived by adding the total amount of fees ($8.6 million) and costs ($3.7 million) and dividing that number ($12.3 million) by $117.9 million, equaling 10.4 percent.

portion of this case were complex, requiring significant medical research and expert testimony, as well as preparation for a two-day entitlement hearing. Indeed, "protracted" litigation and "costly experts" have been substantial in this case. The fees and costs which the firm has been carrying, whether calculated by its formula or by the respondent's, are substantial at $156,343.60 for fees and $75,860.52 for costs based on petitioner's figures, or $78,451.60 in fees and $74,003.52 in costs based upon the respondent's recommendations.

As to respondent's argument that, under *Avera*, hardship refers to that of petitioner and not her counsel, I find respondent's argument lacks support in the law. *Avera* makes no indication, either explicitly or implicitly, that the hardship requirement pertains only to petitioners and not their counsel. In fact, as part of its reasoning for why interim fee awards are appropriate in the Vaccine Program, the Federal Circuit reasoned that "denying interim fee awards would clearly make it more difficult for claimants to secure competent *counsel* because delaying payments decreases the effective value of awards." Id. (emphasis added). Thus, the Federal Circuit clearly considered counsel in its discussion of interim fee awards in the Vaccine Program. The value of awards of fees and reimbursement of costs affects counsel not the individual petitioner.

Furthermore, there is little doubt that petitioner has brought this case in good faith and established a reasonable basis for the claim as noted in *Shaw*. See 609 F.3d at 1375. A ruling on entitlement in favor of the petitioner was issued on May 22, 2015.

Accordingly, petitioner is entitled to an award of interim attorneys' fees and costs based upon the age of the case, the extent of the work performed, and the amount of costs incurred.

## C. Discussion of a Reasonable Hourly Rate

Nine years have passed since the adoption of the *Carr* rate agreement, and the special masters acknowledge and appreciate that it is likely that considerable litigation, such as that involved in this case, has been avoided by the willingness of both sides to agree to a formula for rates. However, it is not unreasonable that the terms of such an agreement be reviewed after the passage of this much time. The parties were strongly encouraged to engage in reasonable discussion of rates that could form the basis of a new agreement. See Transcript dated June 17, 2015 at 4-5. But in light of the respective positions taken, an agreement was not forthcoming. Id. at 7-8.

The petitioner's fee request can best be summarized in table form and therein be compared to the respondent's proposed rate.[9] The table will compare the *Carr* rates for 2014—which includes a CPI adjustment of 1.5 percent, consistent with data provided by the U.S. Department of Labor Statistics for all urban consumers[10]—with the rates proposed by CHC and by the respondent.

---

[9] The information in the Table is taken from petitioner's memorandum, filed March 18, 2015, and respondent's response and sur-reply, filed on May 12, 2015 and June 26, 2015 respectively.

[10] The Bureau of Labor Statistics has a Consumer Price Index ("CPI") Inflation calculator, which uses the average CPI for a given calendar year. See US INFLATION CALCULATOR, *Consumer Price Index Data from 1913 to 2015*, http://www.usinflationcalculator.com/inflation/consumer-price-index-and-annual-percent-changes-from-1913-to-2008/ (last visited Aug. 10, 2015).

| Attorney | *Carr* Rate | Pet. Proposed Rate | Resp. Proposed Rate |
|---|---|---|---|
| Kevin Conway | $358 | $425 | $270 |
| Sylvia Chin-Caplan | $327 | $415 | $250 |
| Ronald Homer | $327 | $415 | $230 |
| Christine Ciampolillo | $216 | $310 | $180 |
| Joseph Pepper | $216 | $295 | $170 |
| Meredith Daniels | $216 | $285 | $160 |
| Paralegals | $108 | $135 | $135 |
| Law Clerks | --- | $160 | $135 |

I will first consider the parties' arguments in favor and against awarding a Washington D.C. forum rate as opposed to awarding a local Boston, Massachusetts rate. Then, I will discuss the current forum rates in Washington, D.C. generally, and forum rates specific to the Vaccine Program. Based on the prevailing rate for legal work in Washington DC, the prevailing rate for cases in the Vaccine Program, the experience of CHC attorneys (both in the Vaccine Program and in the practice of law generally), the quality of work CHC performs in vaccine cases, and the attorneys' reputation in the legal community and community at large, I will determine reasonable 2014 and 2015 forum hourly rates for the above named CHC attorneys, paralegals and law clerks.

### i.     Local Rates vs. Forum Rates

At the time that the *Carr* rate agreement was reached and entered as a decision, *Avera* had not been decided by the Federal Circuit. Most fees were determined by reference to the prevailing rates in the locality of the petitioner's firm. The Federal Circuit in *Avera* directed that fees be based upon the "forum rate," which in this Program would be Washington D.C., except where the work was substantially performed in the firm's home locale *and the local rates are very significantly less than those in Washington D.C. Avera*, 515 F.3d at 1349 (emphasis added). CHC acknowledges that nearly all of its work in vaccine cases is performed in its office in downtown Boston, Massachusetts.  Pet. Memo at 5.  In this case, it appears that but for two days of an entitlement hearing, and some preparation which took place in Washington D.C., essentially all the work was performed in Boston, Massachusetts. Id. This pattern of work is also typical for most cases in the Vaccine Program, where most of the work is performed in the home jurisdiction of counsel.

In support of its application for an increase in hourly rates beginning after March of 2014, CHC has provided references to fee awards for another Massachusetts attorney in the Vaccine Program and to several decisions of the United States District Court for the District of Massachusetts. Petitioner cites to *Oswalt v. Sec'y of HHS*[11] and *Yang v. Sec'y of HHS*[12] in which the same attorney, practicing in Marblehead, Massachusetts, was awarded $340 an hour for work performed in 2007 in *Oswalt* and $370 an hour for work performed in 2009 in *Yang*.[13] Additionally,

---

[11] *Estate of Oswalt v. Sec'y of HHS*, No. 03-2153V, 2011 WL 2149932, at *3-*4 (Fed. Cl. Spec. Mstr. May 2, 2011).

[12] *Yang v. Sec'y of HHS*, No. 10-33V, 2013 WL 4875120, at *1 (Fed. Cl. Spec. Mstr. Aug. 22, 2013).

[13] In *Yang*, the special master held that "the local market rate for Boston is not very significantly below the DC forum rate, and therefore [petitioner's attorney] receives the forum rate. See *Yang*, 2013 WL 4875120, at *4. Respondent contends that the special master's conclusion in that

the petitioner submits references to three District Court cases in which rates of $409 to $425 were approved for partners and $290 to $310 for associates. See Pet. Memo at 8 (citing *Barbosa v. Hyland*, 2014 WL 1847211, at *3 (D. Mass. 2014) which awarded $425 for a partner with 33 years of experience and $310 for an associate with 11 years of experience in a police misconduct, civil rights case, *Shirokov v. Dunlap et al.*, 2014 WL 1271557, at *2 (D. Mass. 2014) which awarded an attorney rate of $409 in a small consumer class action case, and *Rosie D. ex rel. John D. v. Patrick*, 593 F. Supp. 2d 290, 293 (D. Mass. 2009), a significant civil rights case in which the plaintiff's counsel reduced their hourly rate by more than a third to $290-$425 for the attorneys and $125-$145 for paralegals).

The respondent claims that comparable attorneys' rates are 52 percent lower in Boston than they are in Washington, D.C. for partners and approximately 57 percent lower for associates. See Resp. Response at 17-18; Sur-Reply at 2-3.  Respondent further contends that the 52 percent rate differential as to the partners justifies payment of the partners at a local rate, which is substantially less than the rates paid to date under the *Carr* agreement, and also very substantially less than the rate CHC proposes here. Resp. Response at 17-18. Respondent argues that the 57 percent differential as to associates, all with less than 10 years of experience as attorneys, also justifies payment at a local rate for their work. Sur-Reply at 2-3.

At first blush, the assertion that comparable attorneys' fees in Boston could be 52 to 57 percent lower than those charged in Washington, D.C. seemed mildly astonishing, so I endeavored to carefully evaluate the data supporting this claim as supplied by the respondent in exhibits attached to her response, as well as other publicly available information which I provided to both parties for comment. See Order, filed Aug. 10, 2015. I also reviewed decisions awarding fees in the Vaccine Program and Massachusetts District Court as submitted by the parties.

As the primary basis for her arguments, respondent submits excerpts from the "Real Rate Report for 2014" marked as exhibit Z. The Real Rate Report ("RRR") is a product of Datacert/Tymetrix. Resp. Ex. Z at 1. The RRR reports on corporate billing rates paid to small, medium, and large law firms in different practice areas serving corporate clients. The Executive Summary of the report states that this year's data contains more than $16 billion in legal spending data from corporations and law firms e-billing and time management solutions, as well as other industry sources. Resp. Ex. Z at 5. The study reports on rates in various metropolitan areas and defines small firms as those with fewer than 50 lawyers. Resp. Ex. Z at 11-14.

Respondent argues that the size of the firm is the primary driver of higher fees, with the largest firms receiving the highest fees. See Resp. Response at 12.  She further argues that because CHC is a small firm with only six lawyers, it should be compensated at the lowest rate in the proposed category. Id.  Respondent submits data on the category denoted "General Liability Litigation" in the Boston area, which respondent suggests is the most appropriate for comparative purposes. See Resp. Ex. Z at 14. In this category, based on invoices to corporations covering 37 partners and 67 associates, hourly rates for the lowest quartile for partners in 2013 was $198.00, for the second quartile $220.00, and for the third and highest $260.00. Id.  The report also showed the mean rates for the category of partners in the small firm general liability category as moving

---

decision should be disregarded as she did not have before her the respondent's new evidence as discussed here.

from \$210.26 in 2011, to \$221.36 in 2012, and \$234.42 in 2013. <u>Id.</u>  The mean rates for the category of associates moved from \$168.28 in 2011, to \$169.44 in 2012, and to \$173.14 in 2013. The respondent compared these rates to those paid in the Vaccine Program and argued that the Boston rate was very significantly different. <u>See</u> Res. Response at 17. Based primarily on this report, the respondent argues that CHC's proposed rate increases are not reasonable and rather the firm's fees should be substantially reduced from the *Carr* rates by approximately 24 to 29 percent.

Unfortunately, the term "General Liability Litigation" is not defined in the excerpts from the study submitted as exhibit Z. It is difficult to tell what it includes, but I can deduce that the category does not include plaintiff's personal injury litigation as that is done on contingency basis, and is not typically a service performed for corporations.  It does not include insurance defense, as that is another category explicitly noted on the page submitted. <u>See</u> Resp. Ex. Z at 164.  It does not include large corporate litigation, which is primarily done by the most highly paid large firms. Nor does it include patents, or finance and securities, as these areas are also broken out on respondent's exhibit Z at page 14.

Most significantly, respondent did not provide RRR comparative data for general liability litigation in Washington D.C., so that the proverbial apples to apples comparison could be made. Instead, respondent compared general liability litigation by small firms in Boston, Massachusetts to "forum" rates in the Vaccine Program. Petitioner argues that this comparison is inappropriate in that the firms doing general liability litigation are not specialized in a particular area, such as vaccine practice, those firms expect monthly payment of bills, and they do not front and carry costs for prolonged periods of time.  In particular, petitioner further argues that no firm that could have been included among the Boston firms in the RRR study has ever done a vaccine case, nor is it likely that they would, as the initial outlay of capital would be too great and the learning curve for the science and medicine involved would be too steep. As it is unlikely that firms practicing in the small general liability category, which does not include insurance defense, would have any significant personal injury experience, much less experience with complex personal injury issues, it would appear that this point is well taken.

Considerations of the billing and cost model of general liability practice is also significant, as the Vaccine Program operates on a model that defers the reimbursement of fees and costs, in most cases, to the conclusion of the case—which can vary from months to, as in this case, multiple years.  Firms practicing corporate law, whether it be litigation or transactional, virtually always rely on a monthly billing model or at least something close to that, like a quarterly billing system. They expect prompt reimbursement of costs, or in many instances, expect the client to pay directly for items like expert fees. Firms carrying substantial costs, like vaccine firms or plaintiffs' personal injury firms, frequently finance costs through a credit line, causing them to incur interest costs which are not reimbursed by the Program.  Accordingly, the comparison of small general liability firms in one market to vaccine specialized firms in the forum is not a comparable comparison and is not helpful to the analysis.

The RRR does provide some information that is informative, even if it is drawn entirely from corporate billings.  The Executive Summary of the RRR states:

Lawyer rates have risen in each of the past seven years that we have analyzed

lawyer invoices—even despite a significant decline in economic growth in 2008 and 2009. That said, lawyer rate increases in 2013 indicate a stabilizing post-recession trend of approximately 3.7% (which is in line with the prior five year average), which is a sizable decrease from pre-recession increases of closer to 7% per year.

Resp. Ex. Z at 7.

Obviously the RRR summary indicates that lawyer fees are continuing to increase albeit at a slower rate than they were prior to the recession. Id. However, when compared to increases in the CPI, upon which the *Carr* rates were based, it is apparent that lawyer rates increased, even in the post-recession years, at a rate well in excess of the CPI.[14]

Respondent also submitted exhibit AA, which is an excerpt from an analysis of the RRR undertaken by the New England In-House magazine.[15] The article reviewed the RRR data and compared rates for lawyers in the top twelve North American cities. Based on the RRR data and as set forth in exhibit AA, the article explained that indeed the average rate for Washington D.C. lawyers was somewhat higher at $649.24 an hour for partners and $411.55 for associates. Id. In Boston, the average for partners was $598.69 and for associates $388.21. Washington D.C. was the third most expensive city for lawyer rates, behind New York and San Francisco; Boston was the sixth most expensive in the United States. Id. Comparatively the Washington, D.C. rate was 8 percent higher for partners and 6 percent higher for associates. Exhibit AA also showed that rates for litigation in Boston, excluding insurance, increased by 28.9 percent from 2010 to 2012. Litigation rates for partners in Boston ranged from $325 an hour at the low end to $708 at the highest level. See Resp. Ex. AA, chart F. Thus, the distinction between the Boston and Washington, D.C. market exists, but is not significant.

"When the parties do not provide reliable evidence, the court can look to other evidence to establish a reasonable hourly rate." *Dougherty v. Sec'y of HHS*, 2011 WL 5357816 at *6 (Fed. Cl. Spec. Mstr. Oct. 14, 2011) (citing to *Rupert ex rel. Rupert, v. Sec'y of HHS*, 52 Fed. Cl. 684, 688-89 (2002)). To that end, additional comparative data can be found in Occupational Employment

---

[14] According to the United States Bureau of Labor Statistics, the rate of increase in the CPI beginning with the base year of 2009, and showing the rate of increase for each year over the prior one, was 2010 – 1.6 percent, 2011 – 3.2 percent, 2012 – 2.1 percent, 2013 – 1.5 percent, 2014 – 1.6 percent.

[15] See generally, Brandon Gee, *The Going Rate(s): 2013 'Real Rate Report' Reveals Who's Charging What in the Legal Community*, NEW ENGLAND IN-HOUSE, Dec. 2013, at 1, *available at* http://www.pageturnpro.com/Lawyers-Weekly/35126-New-England-In-House--June-2013/index.html#/1. The New England In-House magazine is a publication by the Dolan Company—a company which provides "business information and professional services to legal, financial and real estate sectors . . . across the United States." THE DOLAN COMPANY, http://thedolancompany.com/ (last visited Aug. 10, 2015). It currently publishes 35 print and online publications for clients in the legal, financial, and real estate industries. See generally, id.

Statistics from the U.S. Bureau of Labor Statistics.[16] The hourly mean wage for lawyers in Washington, D.C. in 2014 was $81.13[17] and in Boston $71.08.[18]  Annual mean wage for lawyers in Washington, D.C. was $168,740[19] and in Boston $147,850.[20]

In reviewing the federal government's salary and wages locality pay tables, which are used by the federal government to equalize the rate of pay for federal employees in different metropolitan areas, the Boston-Worcester-Manchester area rate adjustment is 24.80 percent while Washington D.C. is 24.22 percent,[21] suggesting a slightly higher cost of living in the Boston area. Further, using a cost of living calculator to compare the cost of living between the two metropolitan areas, which are the 22nd and 24th largest cities in the country respectively,[22] a person making $100,000 a year in Washington D.C. could maintain the same standard of living in Boston for $97,906.49.[23] Similarly, according to another cost of living calculator, an associate attorney earning $100,000 a year in Washington, D.C. could maintain the same standard of living in Boston on $98,349.00 per year.[24] Not surprisingly, the cost of living in the two metropolitan areas appear to be nearly the same by all three indexes.

Both parties provided cases of fee awards in the Boston area, supporting their respective positions, with court-approved rates for partners ranging from $250 to $425. See, e.g., *Barbosa v. Hyland*, No. 11-11997-JGD, 2014 WL 1847211, at *3-*4 (D. Mass. 2014) (allowing $425 an hour for lead counsel with 33 years of experience and $310 to $322 for a senior associate with 11 years of experience in a police misconduct civil rights case); *Rosie D. ex rel. John D. v. Patrick*, 593 F. Supp. 2d 325, 331 (D. Mass. 2009) (awarding a large law firm, Wilmer Hale, $290 for associates

---

[16] UNITED STATES DEP'T OF LABOR BUREAU OF LABOR STATISTICS, *Occupational Employment Statistics*, http://www.bls.gov/oes/ (last visited July 13, 2015).

[17] See UNITED STATES DEP'T OF LABOR BUREAU OF LABOR STATISTICS, *District of Columbia – May 2014 OES State Occupational Employment and Wage Estimates*,
http://www.bls.gov/oes/current/oes_dc.htm#23-0000 (last visited July 13, 2015).

[18] See UNITED STATES DEP'T OF LABOR BUREAU OF LABOR STATISTICS, *Boston – Cambridge – Quincy, MA-NH – May 2014 OES Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates,* http://www.bls.gov/oes/current/oes_71650.htm#23-0000 (last visited July 13, 2015).

[19] See *supra* n. 17.

[20] See *supra* n. 18.

[21] See OPM.GOV, *General Schedule*, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2015/general-schedule/ (last visited July 13, 2015). The OPM uses salary surveys from the Bureau of Labor Statistics to set locality pay.

[22] See *Top 100 Largest Cities | 2015 U.S. Population Data*, http://www.biggestuscities.com/ (last visited Aug. 31, 2015) (stating Washington D.C. had a population of 658,893 in 2014, and Boston, Massachusetts had 655,884 in 2014).

[23] *Cost of Living Calculator | Comparison Tool*,
http://www.bankrate.com/calculators/savings/moving-cost-of-living-calculator.aspx (last visited July 13, 2015).

[24] PAYSCALE, *Cost of Living Cities- Washington District of Columbia and Boston Massachusetts for Associate Attorney*, http://www.payscale.com/cost-of-living-calculator/Massachusetts-Boston/District-of-Columbia-Washington/Associate-Attorney (last visited July 13, 2015).

and $425 an hour for partners based on the firm's own reduction to 62 percent of its normal hourly rates. Significantly, the court also found that the reduced Wilmer Hale rates were appropriate for the public interest lawyers outside the firm who worked on the case as well). All cases cited by the parties provided imperfect comparisons, either because the case was not analogous to vaccine litigation, or the rate decision was prompted by extraneous factors not relevant to the instant case. See e.g., *Shirokov v. Dunlap, Grubb & Weaver PLLC*, No. 10-12043-GAO, 2014 WL 1271557, at *1-*2 (D. Mass. 2014) (allowing $409 per hour in a small consumer class action); *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 53 F. Supp. 3d 312, 322 (D. Mass. 2014) (allowing $250 an hour for an attorney from Lynn, Massachusetts in a Fair Debt Collection Practices Act case. Petitioner in this matter (*McCulloch*) contends Lynn is a considerably less expensive market than Boston); *Gardner v. Simpson Financing, et al.*, 963 F. Supp. 2d 89, 93-94 (D. Mass. 2013) (holding that the grossly inflated and insufficient billing records justified a substantial reduction of fees in a relatively simple case involving a covenant of quiet enjoyment and an apartment house fire. The court reduced the hourly rate to $250 for a Boston law firm partner with 29 years of experience); *Aly v. Mohegan Council, Boy Scouts of America*, 871 F. Supp. 2d 19, 28 (D. Mass. 2012) (awarding the requested amount of $250 an hour in a civil rights case to an attorney newly admitted to the Massachusetts District Court).

Petitioner has also cited two cases in which fees were awarded to the only other Massachusetts practitioner in the Vaccine Program with a published fee decision on her hourly rate.[25] Elaine Sharp (practicing in the nearby community of Marblehead, Massachusetts), who was admitted to law practice in 1987 and to the Court of Federal Claims in 2003,[26] was awarded $340 an hour for her work in 2007 in *Estate of Oswalt*. See No. 03-2153V, 2011 WL 2149932, at *3-*4 (Fed. Cl. Spec. Mstr. May 2, 2011). A review of the court's electronic filing system reveals that Ms. Sharp filed her first case in the Program in 2003. She was awarded $370 an hour in *Yang* for work done in 2013, by which time she had 26 years of legal experience and about 10 years of experience litigating cases in the Vaccine Program. See No. 10-33V, 2013 WL 4875120, at *1 (Fed. Cl. Spec. Mstr. Aug. 22, 2013). This determination of a reasonable fee is higher than has been awarded under the *Carr* agreement to even the most senior CHC partners. Furthermore, in *Yang*, Special Master Millman found that Boston rates were not much different than Washington D.C. rates. Id. at *3.

In deciding attorneys' fees and costs in the Vaccine Program, special masters have reviewed evidence, affidavits, and testimony from various practitioners in the localities of the petitioning attorney to establish a prevailing rate. See, e.g., *Mooney v. Sec'y of HHS*, No. 05-266V, 2014 WL 7715158, at *4-*5 (Fed. Cl. Spec. Mstr. Dec. 29, 2014); *Masias v. Sec'y of HHS*, No. 99-697V, 2009 WL 1838979, at *5-*6 (Fed. Cl. Spec. Mstr. June 12, 2009) (clerical errors in fees judgment corrected pursuant to R.C.F.C. 60(a) in 2013 WL 680760 (Fed. Cl. Spec. Mstr. Jan. 30, 2013). Generally, the fee comparisons from other practice areas were found unsatisfactory in various respects. Corporate billings are not comparable to fees paid by individuals. Plaintiffs'

---

[25] A review of the list of vaccine attorneys maintained by this court indicates that only three other attorneys from Massachusetts, beside those in the CHC firm and attorney Elaine Sharp, litigate vaccine cases. Two of the other three have handled fewer than five cases each. No other attorneys, besides those in the CHC firm, have offices in Boston, Massachusetts.

[26] The source of dates of admission are Martindale Hubbell as to law practice and the U.S. Court of Federal Claims as to this court.

personal injury cases are done on a contingency basis. Insurance companies can dictate low rates because they can promise a significant volume of business to an insurance defense firm.[27] Respondent here is correct in that the bigger law firms command very high hourly rates mostly because they are representing the largest corporations or wealthy individuals in high value litigation or transactions where the market will bear high fees for representation by prestigious firms. See Resp. Response at 11 n. 20, 11-13. However, the size of the firm is hardly the relevant consideration in determining a reasonable rate for vaccine cases. It seems unlikely that, if a lawyer from a large corporate firm decided to handle a vaccine case, the respondent would readily agree to pay his or her usual $700 hourly rate to do so. In fact, in the Vaccine Program, the fees of a large Washington D.C. firm were reduced consistent with respondent's objection from a $480 rate for associates and as much as $710 for a partner. See Hasson v. Sec'y of HHS, No. 04-03V, 2014 WL 5466609, at *11 (Fed. Cl. Spec. Mstr. Oct. 7, 2014). In that case, the Program awarded $340 to $360 an hour for work done between 2006 and 2010. Id. at *14.

I find the greatest similarities between vaccine practice and other practice areas is in the comparison to plaintiffs' personal injury work. In both types of cases, the lawyers are representing injured individuals, who are not expecting to receive a monthly bill. In most instances, the firms are relatively small. In the case of personal injury work, the fee is paid from a recovery, with most firms charging between 33.3 percent and 40 percent. In the vaccine cases, the Program pays the fee. See 42 U.S.C. § 300aa-15(e) (2012). In both types of practice, the fees are not recovered until the end of the case, and the firms expend the money to pay for experts, medical records, exhibits, travel and other costs. In most instances, these costs are not recovered until the end of the case. In both types of cases, the plaintiff or petitioner has the burden of proof and must build the entire case, finding appropriate experts to address the issues raised. As is often argued in respondent's briefings, the Federal Circuit has recognized that it is petitioner's burden to do the "heavy lifting" to meet the preponderance standard in these cases, citing to Althen, 418 F.3d at 1280 and Lampe v. Sec'y of HHS, 219 F.3d 1357, 1360 (Fed. Cir. 2000).

Of course, there are also significant differences between these practice areas, in that in a non-vaccine personal injury case (which can include auto accidents, medical malpractice, products liability, toxic torts, construction accidents and others) the plaintiff must prove negligence or product defect in addition to causation and damages. There are often anywhere from one or two to twenty-five or thirty depositions in individual personal injury cases, and at times motion practice. If a case comes to trial, and less than 10 percent do, there is the added complexity of a jury trial with the presentation of evidence adhering strictly to the rules of evidence. The value of the fees in those cases, if converted to an hourly rate, varies greatly. The occasional multi-million dollar case will usually generate a high hourly rate, but so would the $30,000 auto accident case which requires 8 to10 hours to prepare the evidence and present a demand. The efficient handling of this type of case results in a fee of a little over $1000 an hour at a one-third contingency. Cases that are heavily litigated and resolve for less than major dollars generate lower fees. There is also the occasional case that is lost and results in a write off of time and expenses. Firms that have maintained longevity in practice tend to minimize their exposure to losing cases by rejecting them

[27] For further discussion on the insurance defense firm model, see Special Master Edward's decision on remand in Rupert v. Sec'y of HHS, No. 99-774V, 2002 WL 31441211, at *2-*3 (Fed. Cl. Spec. Mstr. Aug. 26, 2002), remanded by 55 Fed. Cl. 293 (2003).

at the outset.[28]

In *Rupert IV,* Judge Christine Miller held that the skill set of vaccine attorneys was most equivalent to personal injury, medical malpractice, and products liability litigators, but because the testimony of attorneys in that case reflected upon rates for complex commercial matters as a proxy, the court needed to consider fees in a broader range of complex civil matters. *Rupert v. Sec'y of HHS*, 55 Fed Cl. 293, 306 (2003). The special master in *Masias* observed the difficulty in following that ruling, in that it gave little guidance as to the meaning of the term "complex civil matters." *Masias v. Sec'y of HHS*, No 99-697V, 2009 WL 1838979, at *16 (Fed. Cl. Spec. Mstr. June 12, 2009). As also noted in *Masias*, the special master observed that the witnesses whose testimony was heard in *Rupert* practiced in the fields of civil rights, commercial litigation, and shareholder derivative actions. Id.

In the Vaccine Program, in most instances, the petitioner's counsel will be paid even if petitioner loses, as long as the case is brought in good faith and with a reasonable basis. Negligence does not have to be proven against the defense of a potentially culpable tortfeasor, but causation does.[29]  In Vaccine Program cases, as in a great many tort cases that would fit into the complex category, the most difficult issue is causation. It is usually not the procedure or the rules of evidence that make personal injury or civil rights cases complex and difficult, but the substance of the case. The most difficult substantive issue is often the same one that bedevils vaccine litigation— causation.  In fact, in vaccine cases the interplay between the immune system and the nervous system, or other bodily systems, presents substantive complexity that often exceeds the level of difficulty in complex tort cases, requiring the attorney to develop some command of difficult scientific concepts and language to capably handle the case.

Whatever constitutes the category of general liability litigation done by small firms, (most likely including smaller contract claims, employment discrimination defense, defense of uninsured clients, bill collection or possibly landlord and tenant issues) the cases are litigated in the nomenclature of everyday life. They do not involve concepts of medical diagnosis and complex theories in molecular biology as must be presented by petitioner's counsel in vaccine cases. See *Mooney v. Sec's of HHS*, No. 05-266V, 2014 WL 7715158, at *6 (Fed. Cl. Spec. Mstr. Dec. 29, 2014) (finding vaccine cases more analogous to tort, personal injury, medical malpractice, or medical products liability cases under the Federal Tort Claims Act). Several Vaccine Program cases have noted the greater procedural complexity of civil personal injury cases, noting that discovery and motion practice are often involved, as well as jury trials and the strict use of the rules of evidence. See, e.g., *Masias*, 2009 WL 1838979, at *20-*22; *Scharfenberger*, 2015 WL 3526559, at *7. While it is certainly true that vaccine cases have limited discovery and motions,

_____

[28] Civil rights cases also bear similarities in that they often involve issues of personal injury with the additional feature that the attorneys are eligible for fees under fee-shifting statutes when liability, causation, and damages are successfully proved. In that event, in the Washington D.C. forum, the Laffey Matrix may then apply.

[29] Causation has to be proven in a vaccine case, unless a petitioner is alleging a Table claim, in which case the petitioner must put forth preponderant evidence that he or she has met the requirements as established by the Vaccine Injury Table. See § 300aa-14; see also 42 C.F.R. § 100.3. Vaccine causation is presumed in a successful Table case. Id. However, for roughly more than the past two decades, the vast majority of cases in the Program are non-Table claims.

and have no jury trials, the added time involved in handling those functions of a civil case would be reflected in increased fees based upon the number of hours expended, at least in the case of hourly billers receiving fees under fee-shifting statutes in which the lodestar method is used to calculate awards, as well as in commercial litigation. Thus, it is not clear that the absence of discovery and motions should justify a substantially lower hourly rate, as that difference is reflected in fewer hours billed.

Respondent argues, in quoting *Rodriguez v. Sec'y of HHS*, 632 F.3d 1381, 1385-86 (Fed. Cir. 2011), that because Vaccine Program attorneys are "practically assured of compensation in every case, regardless of whether they win or lose," the Program risks overcompensating vaccine attorneys relative to attorneys in other fee shifting cases where they must succeed on those claims in order to receive fees. Sur-Reply at 7. This is certainly a valid argument, even though respondent periodically raises a reasonable basis objection to attorneys' fees in unsuccessful cases and does not account for time spent in reviewing and rejecting non-meritorious vaccine cases for which potential clients sought representation. Nevertheless, Vaccine Act fees and those sought by CHC in this case are generally significantly less than the Laffey Matrix fees, which are used in other fee-shifting cases in Washington D.C., so as to provide a risk premium to non-vaccine attorneys.

Despite the many similarities between vaccine practice and plaintiff's personal injury work, the comparison also has many dissimilarities and suffers from the same lack of comparability as most other areas of practice. For purposes of lodestar fee analysis, the relationship of the fee to the outcome, rather than to the volume of work, makes the comparison quite difficult. Therefore, I have concluded that for purposes of comparing the Washington D.C. forum rate to the Boston rate for attorneys' fees, the overall comparability of attorneys' fees in those communities is the most relevant and demonstrable consideration. Respondent's evidence for average attorneys' fees and for litigation fees in general demonstrates a small differential. Similarly, contingent fee percentage rates for personal injury are similar throughout the country and certainly are not significantly less in Boston than they are in Washington D.C.[30]

After review of the study provided by the respondent and other generally available data regarding attorneys' fees in the comparative metropolitan areas, as well as cost of living data, I can find no persuasive support for the argument that average attorneys' fees in Boston are "very significantly" lower than they are in Washington D.C.  While the prevailing rates in Washington D.C. appear to be somewhat higher than Boston rates, they are not significantly so. In addition, the RRR study does not account for "skill, experience, and reputation" in the relevant community or complexity of the subject matter of the practice, all of which should be relevant considerations in arriving at a reasonable attorneys' fee. As stated in *Avera*, regarding local rate analysis, comparisons must be to attorneys of reasonably comparable skill, experience, and reputation. 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 895, n.11); see *Hensley v. Eckerhart*, 461 U.S. 424, 429-

---

[30] Most contingent fees range from 33.3 percent to 40 percent. Sixteen states have enacted statutory limitations on medical malpractice fees. Massachusetts limits fees in malpractice cases (but not others) to 40 percent of the first $150,000, 33.3 percent of the next $150,000, 30 percent of the next $200,000, and 25 percent of damages that exceed $500,000. See OLR RESEARCH REPORT, *Medical Malpractice—Attorneys' Fees*, http://www.cga.ct.gov/2003/olrdata/jud/rpt/2003-r-0664.htm; see also Mass. Ann. Laws ch. 231, § 60I.

37 (1983).

Accordingly, I find that pursuant to *Avera,* the appropriate rate for CHC attorneys will be determined by consideration of the forum rate. *Avera*, 515 F.3d at 1349; see *Rodriguez*, 632 F.3d at 1382; see also *Sabella v. Sec'y of HHS*, 86 Fed. Cl. 201, 205 (2009).

## ii.   The Forum Rate

The Federal Circuit in *Avera* held that unless there is a very significant difference favoring Washington D.C. the forum rate should apply, and the forum is Washington D.C. where the U.S. Court of Federal Claims is located. *Avera,* 515 F.3d at 1349. As previously noted, CHC acknowledges that almost all of its work on vaccine cases is done at its office in Boston,   See Pet. Memo at 5. However, as explained above, I have concluded that the difference in lawyer rates between the Boston, Massachusetts and Washington D.C. markets, as well as cost of living, is minimal and thus the forum rates will apply.

Determining the prevailing rates "for similar services by lawyers of reasonably comparable skill, experience and reputation," and the appropriate practice model for fees in the Vaccine Program, is a challenge that can be approached in different ways. *Blum*, 465 U.S. at 897 n. 11; see generally, *Barrett v. Sec'y of HHS*, 09-389V, 2014 WL 2505689, at *12 (Fed. Cl. Spec. Mstr. May 13, 2014) (commenting that determining reasonable hourly rates can be difficult because there is relatively little guidance about how to determine the prevailing market rate for similar services); see also *Information Sciences Corp. v. United States*, 86 Fed. Cl. 269, 291 (2009) (stating that although "[t]he United States Supreme Court recently held that a 'prevailing party that satisfies EAJA's other requirements may recover . . . paralegal fees from the Government at prevailing market rates,'" the Court "did not provide trial courts with guidance in how to determine 'the prevailing market rate.'" (internal citations omitted)).

Decisions on Vaccine Program rates often considered affidavits and other evidence from attorneys practicing primarily in the locality of the petitioner's counsel. Special masters have expressed frustration with the inaptness of most of the evidence presented, because most of it did not reflect knowledge of the practice in the Vaccine Program or have sufficient similarity to Vaccine Program cases to intelligently inform the decisions. See, e.g., *Masias*, 2009 WL 1838979, at *20 (commenting that "[t]he various affiants provided little, if any, reasoning that underlies their conclusion that the Vaccine Program is complex"); *Mooney*, 2014 WL 7715158, at *6 (commenting that "unfortunately, there is relatively little guidance about how to determine the 'prevailing market rate' for 'similar services'"). Petitioner's counsel were criticized for presenting expert testimony from local attorneys or consultants to establish prevailing rates in the forum as an excessive expenditure of costs.  See, e.g., *Scharfenberger*, 2015 WL 3526559, at *14; *O'Neil*, 2015 WL 2399211, at *12.

Since *Avera,* special masters have built upon cases such as *Masias, Mooney* and *Rodriguez.* The forum rates in *Mooney* and *Rodriguez* were largely based upon comparisons to rates charged by attorneys in the vaccine attorney's local area.  See *Rodriguez*, 632 F.3d at 1387; *Mooney,* 2014 WL 7715158, at *40. In *Masias*, the special master determined a Washington D.C. forum rate of $250 to $375 an hour based on a comparison to rates awarded to two Virginia attorneys in vaccine

cases, and an attorney in a fee shifting case. *Masias*, 2009 WL 1838979, at *24-*25. In subsequent cases, special masters utilized the rates in those cases and applied an inflation factor to bring the rates to current market rates. Special masters in multiple cases have determined that the most reasonable forum is the Vaccine Program itself. See e.g., *Guerrero* v. *Sec'y of HHS*, 12-689V, 2014 WL 5335301, at *5 (Fed. Cl. Spec. Mstr. May 22, 2015); *Scharfenberger*, 2015 WL 3526559, at *6; *O'Neil,* 2015 WL 2399211, at *8-*9; *Barrett,* 2014 WL 2505689, at *12; *Tieu Binh Le v. Sec'y of HHS,* 07-895V, 2014 WL 4177331, at *3 (Fed. Cl. Spec. Mstr. Sept. 23, 2015). The special masters also gave significant consideration to the years in practice of each attorney, the years in vaccine practice in particular, and the extent of experience during that time.

Utilizing this methodology, Special Master Corcoran noted in *Scharfenberger* that the Federal Circuit in *Avera* held that generally the forum rate in Washington D.C. should be used for Vaccine Program attorneys and that a "'reasonable' hourly rate is, at bottom, defined as the rate 'prevailing in the community for *similar* services by lawyers of reasonably comparable skill, experience and reputation.'" *Scharfenberger*, 2015 WL 3526559, at *6 (citing *Avera*, 515 F.3d at 1348) (emphasis in original). He then held that the Vaccine Program itself provided the most relevant baseline for comparing attorney billing rates because other types of practice do not provide perfect comparisons to vaccine practice. Id. Special Master Corcoran then took the fees determined to be reasonable as Washington D.C. forum rates for 2009 in *Masias*, which was in a range of $250 to $375 an hour for lawyers with more than 10 years' experience, and in *Rodriguez* in which the forum rate for attorneys with more than 20 years' experience was held to be $275 to $360 an hour, and then applied a CPI adjustment which brought the reasonable range to $272.66 to $413 per hour in 2015. Id. Special Master Hamilton-Fieldman in *O'Neil,* using similar methodology, found a 2014 forum rate of $413. *O'Neil,* 2015 WL 2399211, at *6-*8.

The Laffey Matrix is often referenced as a data point in consideration of reasonable attorneys' fee rates in fee-shifting cases in Washington D.C. The matrix which was initially developed to evaluate fees in a complex employment discrimination case, see *Laffey v. Northwest Airlines Inc.*, 572 F. Supp. 354 (D.D.C. 1983), affirmed in part, reversed in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), has since been republished annually by the U.S. Attorney's office in Washington D.C. for use in fee-shifting cases.[31] While the Laffey Matrix has never been applied for various reasons in vaccine cases, it provides a valuable structure for considering the prevailing rates in Washington D.C., including the weight to be given to varying levels of experience in the practice of law. Although the petitioner has not requested Laffey rates, and in fact her proposal is

---

[31] The Laffey Matrix was initially approved for use by the District Court in the *Laffey* case for work done in 1981-82. The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year and then rounding to the nearest multiple of $5. The matrix which is prepared by the Civil Division of the United States Attorney's Office for the District of Columbia is intended to be used in cases in which a "fee shifting" statute permits the prevailing party to recover "reasonable attorneys' fees." The explanatory note to the updated Laffey Matrix references Civil Rights cases, Freedom of Information Act cases and Equal Access to Justice Act cases by way of example. *Laffey Matrix – 2014-2015 Explanatory Notes*, http://www.justice.gov/sites/default/files/usao-dc/legacy/2014/07/14/Laffey%20Matrix_2014-2015.pdf (last accessed Aug. 4, 2015); see *Covington v. District of Columbia*, 57 F.3d 1101,1105 n.14 (D.C.Cir.1995), cert denied, 516 U.S. 1115 (1996).

generally less than the Laffey rates, the structure utilized by the U.S. Attorney's office in evaluating rates will be used for comparative purposes here. One of the ultimate problems with the *Carr* agreement, aside from its reliance on the CPI rather than the rate of growth in attorneys' fees, is that it did not provide any enhancement based upon the increased experience level of the respective attorneys. Most law firms increase the rates charged by their attorneys as they progressively gain more experience. Certainly, all of the respondent's exhibits support the notion that partners are generally paid more than associates which reflects increased experience. This is particularly important in this case, as the CHC firm concentrates its practice in the Vaccine Program and thus benefits its clients by a vaccine-concentrated increase in experience for each of the attorneys. Mr. Homer, Ms. Ciampolillo, Mr. Pepper and Ms. Daniels would all have moved from lower to higher Laffey categories since the initiation of the *Carr* agreement while doing exclusively vaccine work. As Laffey stops at twenty years and above, Mr. Conway and Ms. Chin-Caplan did not advance categories but also have benefitted from eight additional years of experience concentrated in the Program.

Based upon a review of fees decisions in the Vaccine Program, the table set forth below was derived from attorneys' fees awarded in vaccine cases in which the decision of the court set forth the rates to be paid in cases decided since 2009. The table also adjusts each of the rates from the year in which they were awarded to 2014 by applying the rate of growth in the CPI and also by the rate of growth in attorneys' fees as stated in the Executive Summary of the RRR, 3.7 percent. See Resp. Ex. Z at 7. For example, if as an alternative to the CPI adjustment for the upper *Masias* rate of $375 for 2009, that rate was adjusted for the 3.7 percent growth in attorneys' fees, that rate would be $449 in 2014, rather than $413 based on the CPI. The decisions in which fees were awarded often used different rates for different years, such as granting a $10 per year increase for each year in which the case continued. For purposes of this table, the last year, which most often was the highest year, is utilized and then adjusted to show a 2014 rate. Attorneys will be listed by the experience categories utilized in the Laffey Matrix. Every effort has been made to identify the year in which the work was performed as opposed to the year of the decision. The Laffey Matrix is based upon the prior year CPI and runs from June 1 to May 31.[32]

**Laffey Category  20 years+ legal experience   Laffey Rate 2013-2014 $510;  2014-2015 $520**

| Case | Attorney | Year of Work | Rate Approved | CPI | RRR average rate |
|------|----------|--------------|---------------|-----|------------------|
| Rodriguez | John McHugh | 2009 | $335 | $369 | $416 |
| Rivard | Stanley Kopps | 2009 | $300 | $331 | $373 |
| Fragoso | Jill Follows | 2010 | $344 | $374 | $412 |
| Whitener | Steve Goldston | 2010 | $300 | $326 | $360 |
| Carcamo | Dale Galipo | 2010 | $327 | $355 | $392 |
| Kennedy | Albert Brooks | 2007 | $325 | $370 | $418 |
| Rodriguez | Gilbert Gaynor | 2012 | $295 | $305 | $329 |
| Tieu Binh Le | Brian Arnold | 2012 | $295 | $305 | $329 |
| Garrett | Sean Greenwood | 2013 | $300 | $305 | $311 |
| Hasson | Paul Honigsberg | 2011 | $360 | $380 | $402 |

---

[32] Laffey Matrix rates are not awarded or considered as a *prima facie* Vaccine Act forum rate here, but its structure is useful for comparative purposes and its rates are considered here as one of multiple factors in determining a reasonable rate.

| | | | | | |
|---|---|---|---|---|---|
| Guerrero | Lisa Roquemore | 2015 | $365 | $365 | $365 |
| Nadar | Simina Vourlis | 2014 | $300 | $300 | $300 |
| Yang | Elaine Sharp | 2011 | $370 | $390 | $413 |

**Laffey Category  11-19 years legal experience  Laffey Rate 2013-2014 $450;  2014-2015 $460**

| | | | | | |
|---|---|---|---|---|---|
| O'Neil | Altom Maglio | 2011-2013 | $300 | $305 | $311 |
| O'Neil | John Caldwell | 2011-2013 | $300 | $305 | $311 |
| Carcamo | Z. Kohanim | 2010 | $293 | $318 | $351 |
| Rowan | Patricia Finn | 2014 | $310 | $310 | $310 |
| Mooney | Michael Cave | 2013 | $270 | $274 | $290 |

**Laffey Category 8-10 years legal experience  Laffey Rate  2013-2014 $360;  2014-2015 $370**

| | | | | | |
|---|---|---|---|---|---|
| O'Neil | Isaiah Kalinowski | 2012-13 | $325 | $330 | $337 |

**Laffey Category 4-7 years legal experience     Laffey Rate 2013-2014 $295;  2014-2015 $300**

| | | | | | |
|---|---|---|---|---|---|
| O'Neil | Danielle Strait | 2012 | $295 | $304 | $329 |
| Rowan | Jonathan Victor | 2013 | $220 | $223 | $228 |

It should be noted that the above data as to fee rates was derived from case reports or stipulations in which the hourly rate was reported. Fee issues are most often resolved by stipulation and when fees are stipulated, the hourly rate usually is not reported in the submitted stipulation.  It should also be noted that most of the decisions regarding fees reported above were at least significantly influenced by comparisons to local attorneys.[33]  However, cases in which a Washington D.C. forum rate was requested and denied based upon a finding of a very significant difference in the rates for the local area were not included. For example, the fees awarded in *Masias* and *Avera* are not included in the table as the attorneys practiced in Cheyenne, Wyoming where the attorneys' fees rates were found to be very significantly lower than Washington D.C. rates. The special master's determination of a forum rate of $250 to $375 in *Masias* is considered here but not in the table, as the Special Master awarded local rates in that case.

It is also very important to note that none of the attorneys in the 20+ years of experience category listed above, with the exception of Lisa Roquemore and John McHugh, have close to the same experience in the Vaccine Program as do the three senior partners at CHC. In the second category, Mr. Maglio and Mr. Caldwell have significant vaccine experience and in the third and fourth categories, Mr. Kalinowski and Ms. Strait also have substantial concentrated vaccine experience. Among the others, in all categories, the vaccine experience has ranged from a single case in the Program to several cases per year.

---

[33] See for example *Mooney v. Sec'y of HHS*, No. 05-266V, 2014 WL 7715158, at *4-*5 (Fed. Cl. Spec. Mstr. Dec. 29, 2014) for New Orleans area attorneys. *Tieu Binh Le v. Sec'y of HHS*, 07-895V, 2014 WL 4177331, at *3 (Fed. Cl. Spec. Mstr. Sept. 23, 2015) for Dallas attorneys, and *Garrett v. Sec'y of HHS*, No. 14-16V, 2014 WL 6237632, at *6 (Fed. Cl. Spec. Mstr. Oct. 27, 2014) for Houston attorneys.

The data are not abundant for attorneys from the District of Columbia practicing in the Vaccine Program, as there are very few.  The recent cases which decided a specific Washington D.C. forum rate, *O'Neil* and *Scharfenberger*, awarded fees of $325 to an attorney with 8 years overall and concentrated vaccine experience in *O'Neil*, and $305 to the same attorney in *Scharfenberer*, and $295 to an attorney with 7 years' experience in the relevant year. Clifford Shoemaker, a practitioner from Vienna, Virginia, has represented numerous petitioners in the Program and has received fee awards in many cases.[34] In more recent years, he has received fees in *Andreu* and *Drost* having requested $336 and $337 per hour in 2009 and 2010 respectively. <u>See</u> *Andreu v. Sec'y of HHS*, No. 98-817V, Decision on Attorneys' Fees and Costs, filed Jan. 25, 2011; *Drost v. Sec'y of HHS*, No. 01-502V, Decision on Attorneys' Fees and Costs, filed July 30, 2010. Those rates would be the equivalent of $370 or $416 per hour in 2014, depending upon whether the CPI or the average attorney fee inflation rate was applied.

### iii.    Factors in Establishing Appropriate Rates

As cited in the foregoing discussion, after reviewing cases both in and outside the Program, I have concluded that a multifactorial approach should be used and that the following factors are paramount in deciding the reasonable forum rate:

1. The prevailing rate for comparable legal work in the forum of Washington D.C.;
2. The prevailing rate for cases in the Vaccine Program;
3. The experience of the attorneys in the Vaccine Program;
4. The overall legal experience of the attorneys;
5. The quality of work performed in vaccine cases; and
6. Reputation in the legal community and community at large.

### a.    Prevailing Rate for Legal Work in Washington D.C.

Respondent's evidence quite clearly demonstrates that Washington D.C. is one of the most expensive legal markets in the country. Part of that is driven by the large corporate firms in practice in this forum, and part by the relatively high cost of living in the DC area. Respondent's exhibit AA, which compares "average" rates for lawyers in different metropolitan areas, indicates that the average rate for Washington D.C. is $649 for partners and $411 for associates. An average rate, of course, includes high and low rates, as well as those in between.

The Laffey Matrix may more precisely target appropriate forum rates because it is designed for use in fee shifting cases. The Federal Circuit in *Rodriguez*, 632 F.3d at1384-86 affirmed the special master's refusal to award Laffey Matrix rates in a vaccine case. In its analysis, the court focused on the original *Laffey* case which was a complex employment discrimination case brought on behalf of 3,300 flight attendants. <u>Id.</u> The case was litigated over thirteen years, involved thousands of hours of personnel time, and raised novel issues under Title VII and the Equal Pay Act in the early stages of the development of those bodies of law. <u>Id.</u> In *Rodriguez*, the court distinguished the *Laffey* case from the more streamlined vaccine practice. <u>Id.</u>

---

[34] See *Masias,* 2009 WL 1838979, at Appendix Table 5 for a chart of Mr. Shoemaker's fee awards, in which the lump sum award in approximately 20 cases from 2005-2006 is detailed but no hourly rate is shown.

In *Masias*, 634 F.3d at 1288 n. 6, the Federal Circuit explained its decision in *Rodriguez* stating:

> In *Rodriguez* we addressed 'whether the reasonable hourly rate for attorneys handling Vaccine Act cases in the District of Columbia should be determined by applying the Laffey Matrix, or whether the rate should be determined by considering a variety of factors, which may or may not include the Laffey Matrix.' In *Rodriguez*, **the special master** determined that the Vaccine Act Litigation is not analogous to 'complex federal litigation' as described in *Laffey*, so as to justify use of the matrix rather than consideration of rates charged by skilled Vaccine Act practitioners. The special master therefore rejected the petitioner's claim that the Laffey Matrix sets a **prima facie** forum rate schedule for Vaccine Act attorneys' fees. Instead, to determine the forum rate for compensation of the petitioner's attorneys, the special master analyzed six separate pieces of evidence, **including the Laffey Matrix** . . . . We affirmed the special master, concluding that she had not applied an incorrect legal standard, that she had considered appropriate evidence, and that she had fully explained the basis for determining the fee rates for the petitioner's attorneys.

*Masias*, 634 F.3d at 1288 n. 6 (internal citations removed) (emphasis added in bold).

It should also be noted that in the years since the original *Laffey* decision in 1983, the U.S. Attorney's Office for the District of Columbia has republished the Laffey rates, utilizing the original structure, and applying an inflation adjustment for use in all fee-shifting cases in Washington D.C. These include civil rights cases, employment discrimination, Freedom of Information Act cases, and Equal Access to Justice Act cases. While the *Laffey* case itself was quite complicated and heavily litigated, many of these cases are not as complex as, or no more complex than, vaccine cases in terms of their subject matter and evidence. It is true that before fees are awarded in fee shifting cases there is the requirement that the case be won, that negligence or some other form of liability be proven (in addition to causation in personal injury cases), and that those cases include the array of available discovery devices provided under the Federal Rules of Civil Procedure. However, it should be noted that procedural tasks such as depositions and motions result in the billing of many additional hours, and thus the ultimate compensation in those cases is raised relative to vaccine cases by virtue of the number of hours billed rather than necessarily the hourly rate.

As noted above, the Laffey Matrix rate for 2014-15 was $520 for lawyers with 20 years or more experience; $460 for 11 to 19 years, $370 for 8 to 10 years in practice, $300 an hour for lawyers having 4 to 7 years' experience, and $255 for those with 1 to 3 years in practice. Paralegals and law clerks are at $150 an hour. In my analysis of the appropriate rates for Vaccine Act cases, the Laffey Matrix is utilized for its structure and as one comparative data point, but not as a *prima facie* forum rate.

### b.  Prevailing Rates in Vaccine Cases

While the obtainable data is far from comprehensive as to rates paid in vaccine cases, it appears that after adjustment for inflation and attorney rate increases that rates paid for attorneys with 20 or more years' experience range from about $300 an hour to $425.  For practitioners having between 11 and 19 years' experience the rates range from $275 to $375 an hour, and based upon the very limited data of two practitioners with extensive vaccine experience relative to their years in practice, $275 to $325 for attorneys having between 8 and 10 years of experience. For attorneys having 4 to7 years' experience, $250 to $300.[35]  For attorneys having fewer than four years in practice $150 to $200.

Petitioner argues that vaccine practice is a specialty practice in which relatively few attorneys are engaged. In fact, based upon data from the U.S. Court of Federal Claims, there were 440 lawyers from across the United States who were named as counsel in vaccine cases that have been filed since 2010. Approximately 60 percent of the cases were handled by 30 lawyers and 80 percent were handled by just 57 attorneys.[36] The cases do involve a steep learning curve as the subject matter often involves cutting edge issues in immunology, neurology, rheumatology and gastroenterology, as well as epidemiology, neuropsychology, psychology, and life care planning. The alleged connection between a vaccine and a disease is often to a disease that is not fully understood itself such as epilepsy or multiple sclerosis. In many of the cases, including the present one, the causation case turns on contested issues in microbiology as well. Medical malpractice litigation, brain damage, or toxic torts—which are among the most difficult areas of personal injury practice—often require knowledge of different complex areas of medicine. However, the issues in those subspecialties rarely involve the interplay of the immune system and the central nervous system or other body systems with eminent researchers and scientists offering conflicting testimony on causation, as is often the situation in vaccine cases.

Accordingly, it is reasonable to conclude that vaccine practice is a specialty area that has attracted a fairly small number of attorneys nationwide. It does have a steep learning curve, the need to front costs for expensive experts, and features deferred payment of fees and costs. On the other hand, there is no need to prove negligence or product defect to succeed, and discovery is limited to the production of medical records, expert reports, medical literature and other information about the petitioner such as employment records.

When evaluating rates outside the Program in the Washington D.C. forum, I noted that the average attorneys' fees for all lawyers are substantially higher than the Laffey Matrix, and the rates in the Laffey Matrix are higher than have generally been awarded in vaccine cases (and are higher than what petitioner requests in this case). The higher rate for Laffey Matrix cases reflects a risk premium that is reasonable for fee shifting cases in which the plaintiff must win before counsel is

---

[35] For a practitioner in this category with considerably less vaccine experience who participated as second chair, a fee of $220 was granted in 2014. See *Rowan v. Sec'y of HHS*, 2014 WL 3375588, at *3 (Fed. Cl. Spec. Mstr. June 19, 2014).

[36] In more detail, of 2,814 cases filed by attorneys since 2010, over 1,750 were filed or handled by 30 attorneys.  About 2,200 cases were handled by 57 attorneys, while there were approximately 440 attorneys who handled at least 1 vaccine case since 2010. These figures recognize that there are attorneys who handle cases after other attorneys have filed them.

entitled to fees.

For all of the reasons recited above, I therefore conclude that the range of $350 to $425 an hour for attorneys with more than 20 years of experience is a reasonable forum rate. The higher end of the range should be awarded to those with significant Vaccine Program experience who perform high quality legal work in vaccine cases. Similarly, I have concluded that lawyers with 11 to 19 years of experience may reasonably charge $300 to $375 an hour, with higher rates to be paid to those with significant vaccine experience who perform quality work in these cases. Attorneys with 8 to 10 years' experience may reasonably request and be paid $275 to $350 an hour.  Attorneys in practice for 4 to 7 years may reasonably charge $225 to $300, and those with less than 4 years' experience may receive between $150 and $225.  Particularly, in the latter category, prior clerkships or legal intern work during law school in the Vaccine Program may be considered.

### c.  Vaccine Program Experience and Quality of Work

The Conway Homer and Chin-Caplan firm has concentrated its practice in the Vaccine Program for over 20 years.  It does indeed represent a sizable number of petitioners in the program, from many different states.  CHC attorneys handle both the more straight forward cases in which early settlement is achieved and the most difficult which require complex expert testimony at a hearing.  Special masters have noted in other cases that the firm does high quality work for its petitioners and I concur in that judgment based upon the underlying case in this matter and multiple others which I have reviewed.  If the respondent's tabulation of the number of cases handled and amount of fees received is relevant on any issue in this case, it speaks to the strong reputation that the firm has built in and out of the legal community for handling these cases. Accordingly, the firm's attorneys should be entitled to receive fees in the higher end of the range for their specific level of experience.

The petitioners have presented evidence of the experience of the lawyers who worked on this case along with their requested rate. These are summarized as follows:

**Kevin Conway-**Requested rate of $425 an hour. Mr. Conway has over 45 years of experience in the legal profession and 26 years in the Vaccine Program.  He has represented numerous petitioners before the Office of Special Masters ("OSM"), the Court of Federal Claims ("CFC"), and the Federal Circuit.  He serves as a member of the OSM Process Committee and assisted in the preparation of the Vaccine Program guidelines. He is an Adjunct Professor at Boston College.

**Ronald Homer-**Requested rate of $415 an hour. Mr. Homer has over 24 years of experience as an attorney with 22 years in the Vaccine Program. He is the attorney of record in all CHC cases filed in the Program, which is approximately 3,000 cases.  He has practiced before special masters at OSM, and judges at the Court of Federal Claims, and the Federal Circuit. He has assisted the Chief Special Master in the orderly resolution of claims in the Omnibus Autism Proceeding. He serves on the OSM Outreach Committee and is a member of the CFC Bar Association. Mr. Homer plays a supervisory role in the firm as well as in this case, which is discussed in further detail below.

**Sylvia Chin-Caplan-**Requested rate of $415 an hour. Ms. Chin-Caplan is a partner at CHC. She has 30 years' experience in the practice of law and 17 years in the Vaccine Program. She is also a registered nurse and has practiced as a civil litigator in medical malpractice and product liability cases. She has practiced extensively at OSM, the Court of Federal Claims, and the Federal Circuit. She serves as co-chair of the Science and Technology Subcommittee of the Vaccine Injured Petitioner's Bar Association. She is a member of the CFC Bar Association. Specifically, in this case, Ms. Chin-Caplan presented the direct testimony of Dr. Lawrence Steinman, cross-examined Dr. Arun Venkatesan, and authored parts of the briefs in this case.

**Christine Ciampolillo-**Requested rate of $310 an hour.  Ms. Ciampolillo is a junior partner at CHC.  She has 6 years' experience as an attorney exclusively in the Vaccine Program.  She has handled first chair in multiple vaccine cases and she did the direct examination of one of petitioner's experts, Dr. Svetlana Blitshteyn.  She contributed to the extensive written work product produced for this case.  She serves as Secretary of the Vaccine Injured Petitioner's Bar Association.  Ms. Ciampolillo worked at CHC during law school as a law clerk and was thus familiar with the Program and issues in it when she began work as an attorney. See Pet. Reply at 15. Ms. Ciampolillo has represented petitioners at hearings, and along with Mr. Pepper, has been invited to speak on the Vaccine Program at various conferences.

**Amy Schwader, formerly Amy Fashano-**Requested rate of $295 an hour.  Ms. Schwader, who appears on the billing records of this case as Amy Fashano, had seven years' experience in the Vaccine Program. She is no longer employed by the firm.

**Joseph Pepper-**Requested rate of $295 an hour.  Mr. Pepper is an associate at CHC with 6 years' experience as an attorney.  He has 5 years' experience in the Vaccine Program.  He is lead counsel in multiple Vaccine Program cases and serves in multiple positions in Vaccine Program bar associations.  Mr. Pepper is active in the U.S. Court of Claims Vaccine Bar Association and in the Vaccine Litigation Group of the American Association for Justice. Id. at 14. He has practiced before OSM, the Court of Federal Claims, and the Federal Circuit. Mr. Pepper manages 50 to 60 vaccine cases at all times, has represented petitioners at several hearings and argued appeals. Id. at 15.

**Meredith Daniels-**Requested rate of $285 an hour.  Ms. Daniels has 5 years' experience working as an attorney in the Vaccine Program. She has practiced before the OSM, the Court of Federal Claims, and the Federal Circuit.  She serves on the Board of Governors of the Newly Admitted Lawyers Division of the CFC Bar Association and is a member of the Vaccine Injured Petitioner's Bar Association and the American Association for Justice. Ms. Daniels worked at CHC during law school as a law clerk and was thus familiar with the Program and issues in it when she began work as an attorney. Id. Ms. Daniels has represented petitioners at hearings and argued appeals.

**Law Clerks-**Requested rate of $160 an hour. The law clerks are law students who work at the firm under the supervision of CHC attorneys.  Id. at 20. They perform numerous tasks at lower rates that are often performed by attorneys at other firms.

**Paralegals-**Requested rate of $135 an hour. The firm represents that its paralegals are "well-qualified, carefully chosen college graduates" who also perform many tasks that are performed by attorneys in other firms. Pet. Memo at 15. The paralegals each have several years at the firm doing exclusively vaccine work. The firm represents that it uses law clerks and paralegals to perform tasks whenever possible resulting in minimized fees and conservation of Program resources. See Pet. Reply at 18-21.

The paralegal rate for CHC paralegals is supported by respondent's exhibit BB, the National Association of Legal Assistants and Paralegals 2014 Utilization and Compensation Review. A survey in the exhibit indicates that the highest billing rates are earned by paralegals with college degrees. Resp. Ex. BB at 8 (noting the 2014 average rate billed by a paralegal with a bachelor's degree as $134 an hour). The concentrated work by the CHC paralegals in vaccine work also enhances their value. According to the Utilization and Compensation Review, exhibit BB, paralegal rates range from under $30 an hour to over $200 an hour, with college graduates billing at an average of $134 an hour. Id. at 2, 8.

Based upon all of the factors discussed above with particular emphasis on prevailing rates relative to years of experience, concentrated work in the Vaccine Program, the responsibility assumed in Vaccine Program cases, and the consistently high quality of work in those cases relative to the years of experience, I have concluded that the following rates are currently reasonable for CHC attorneys and staff:

**More than 20 years' experience**
| | |
|---|---|
| Kevin Conway | $415 |
| Ronald Homer | $400 |
| Sylvia Chin-Caplan | $400 |

**Four to Seven years' experience**
| | |
|---|---|
| Christine Ciampolillo | $300 |
| Amy Schwader | $285 |
| Joseph Pepper | $290 |
| Meredith Daniels | $280 |
| | |
| Law Clerks | $145 |
| Paralegals | $135 |

I anticipate utilizing these rates in all other challenges to CHC rates for work performed in 2014 and 2015 currently pending before me.

### D.  Discussion of Reasonable Hours Expended and Costs

Petitioner "bears the burden of establishing the hours expended" in seeking a fee award for those hours. *Wasson v. Sec'y of HHS*, 24 Cl. Ct. 482, 484 (1991), rev'd on other grounds and aff'd in relevant part, 988 F.2d 131 (Fed. Cir. 1993) (per curiam).  Reasonable attorneys' fees are determined by applying the lodestar method of multiplying a reasonable amount of hours expended by a reasonable hourly rate. *Avera*, 515 F.3d at 1347-48 (quoting *Blum*, 465 U.S. at

888). A line-by-line evaluation of the fee application is not required and special masters may rely on their experience with the Vaccine Program and its attorneys to determine the reasonable number of hours expended. See *Wasson*, 24 Cl. Ct. at 484; see also, *Saxton v. Sec'y of HHS*, 3 F.3d 1517, 1521 (Fed. Cir. 1993). The requirement that attorneys' fees be reasonable also applies to costs. *Perreira*, 27 Fed. Cl. at 34.

Petitioner has submitted detailed billing to substantiate her request for attorneys' fees and costs. Respondent has raised numerous objections to hours expended on projects and the number of people doing work on this case. These objections will be addressed below.

Concerning costs, respondent's only objection is for a first class plane ticket purchased by Dr. Steinman to testify at the entitlement hearing, which was reimbursed by the firm. The cost of the ticket was $2,357.00. I agree that the Program should not have to pay first class airfare, and accordingly the price of the plane ticket will be reduced to $680, the approximate cost of a daytime, nonstop flight from San Francisco, California to Washington D.C. See Resp. Ex. CC. This reduction amounts to $1677.00. Thus, petitioner's costs are approved in the amount of $74,183.52, in addition to $250 to be reimbursed to Mrs. McCulloch pursuant to General Order No. 9.

### i.  Summary of the Entitlement Portion[37]

This case was vigorously and capably defended on all fronts by respondent. The government contested the diagnosis, the etiology of the harm, the theory of connection to the vaccine and the logical explanation of the cause. Respondent, now somewhat disingenuously, argues that the case was in fact simple and straight forward, and that there was not significant medical literature submitted. Her objections to time expended by petitioner's counsel in this case largely flow from this proposed notion of simplicity.

At the outset, it should be clear that this was not a simple case. There were 10,438 pages of medical records filed. Pet. Reply at 18. Petitioner filed 34 medical articles and respondent filed 13. The vaccine in question, HPV, was relatively new at the time this petition was filed and did not have a long history of adverse effects. What is more, the underlying cause of the petitioner's severe epilepsy proposed by the petitioner's experts, damage to the aquaporin-4 water channels, was also novel. The aquaporin-4 water channels are themselves a molecular discovery of the twenty-first century. Epilepsy is certainly not a fully understood disease and four highly qualified experts, two on each side, disagreed as to the underlying cause of the petitioner's daughter's severe epileptic disorder. Was the correct diagnosis limbic encephalopathy or febrile infection related epilepsy syndrome—one condition rarer than the other? The causal theory was founded on molecular mimicry and the parties, among other issues, debated the sufficiency of the homology between the vaccine and the aquaporin-4 water channels, as well as the role of the aquaporin-4 water channels in the genesis of epilepsy. Not only were 47 articles from the medical literature filed to address the issues in the case, but the literature involved complex issues of central nervous system anatomy and diagnosis as well as molecular biology. This was a complex case brought on behalf of a very severely injured and impaired minor child. It deserved the full attention of counsel. As the U.S. Court of Federal Claims has said:

---

[37] For a full discussion of petitioner's entitlement to compensation, see *McCulloch v. Sec'y of HHS*, No. 09-293V, 2015 WL 3640610, at *1 (Fed. Cl. Spec. Mstr. May 22, 2015).

> We reject unequivocally any suggestion that an attorney for a petitioner under the vaccine program is warranted in putting out anything less than the highest effort . . . . An attorney for a petitioner under the vaccine program must prepare his [or her] case as if every factual and legal issue will be contested, regardless of how straight forward or uncontested the case may appear with hindsight.  Any other approach would not serve the client's interest.

*Holton by and through Holton v. Sec'y of HHS,* 24 Cl. Ct. 391, 398 (U.S.C.F.C 1991).

This case was heavily litigated and required extensive attention to detail and mastery of complex concepts of medicine and biology.  The petitioner's firm must have discretion in the way it builds and presents its cases.  While it is certainly a difficult task for the respondent to fairly evaluate the reasonable number of hours that are justified in preparation of the case, the analysis should not be overly mechanical as if the tasks in question were simple, which they were not in this case.

### ii.    Objection to Time Spent Preparing the Amended Petition and Affidavit

The guiding principle in evaluating fee petitions is that the work performed and the hours billed must be reasonable.  42 U.S.C. § 300aa-15(e) (2012).  As the United States Supreme Court instructs, when awarding attorneys' fees, special masters may use estimates to achieve "rough justice." *Fox v. Vice,* 131 S. Ct. 2205, 2216 (2011). "'The [trial forum] also should exclude from the initial fee calculation hours that were not 'reasonably expended.' . . . . Counsel for [petitioner] should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.'" *Saxton,* 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983)).

Respondent, as she has in multiple other cases, objects to the amount of time spent in preparing the detailed Amended Petition that the CHC firm often files and did file in this case. Respondent objects that paralegals prepare a chronology of the medical records and therefore that law clerks working on the amended petition are merely "transcriptionists" and attorneys should not have spent more than 1 hour reviewing the 29 page Amended Petition. See Resp. Response at 21.  Petitioner responds that the respondent misconstrues the nature of the medical chronology, which is a summary of all 10,438 pages of the records involved in the case. Pet. Reply at 18-22. The ultimate preparation and selection of the quotations that are used in the Amended Petition requires considerable review of the chronology and the records as well as professional judgment about the narrative prepared. The quotations to be used set forth a clear road map of the case. See id.

I have previously ruled on this objection in *Jones v. Sec'y of HHS* in which I held:

> The undersigned is inclined to agree with petitioner's view that the preparation of the detailed Amended Petition requires significant review, analysis, and

organization of the medical records. Particularly, the undersigned finds that the detailed and organized Amended Petition prepared by counsel in this and other cases is helpful in coming to an efficient understanding of the issues—just as respondent's Rule 4(c) reports are helpful in achieving the same. These reports or petitions require professional judgment as to the relevance of records inserted as well as organization and analysis of the chronologies presented through both the Amended Petition and the Rule 4(c) reports. The undersigned finds that both of these documents were helpful in reviewing the case and finds that it is highly likely that expert witnesses and mediators would have also found them helpful in achieving efficiency in the expenditure of their time. The undersigned also finds that billing seventeen hours of attorney time to prepare the Amended Petition and Affidavit, containing considerable medical detail with direct quotations from the medical records, in addition to approximately twenty-one hours of paralegal time summarizing nineteen exhibits of medical records, to be reasonable in this case.

No. 11-70V, 2014 WL 7508006, at *7 (Fed. Cl. Spec. Mstr. Dec. 4, 2014).

In this case in which the petitioner had over 10,000 pages of medical records and a considerably more complex record than in *Jones*, I found the Amended Petition quite helpful in outlining the case with numerous direct quotations from the medical record. The petitioner also indicated that the Amended Petition served as the basis of a substantial portion of the stipulated statement of facts which the parties were ordered to file after the entitlement hearing in this matter. Accordingly, I will deny respondent's objection to this billing and grant the requested fee for preparation of the Amended Petition at the rates that I have determined to be reasonable above.

Respondent also objects to 12.7 hours for preparation of the affidavit of the petitioner, who is the mother of the injured child. As the affidavit serves as a substitute for the direct examination of the mother, it must be prepared with considerable care and verification of memory against events recorded in the medical records. The affidavit filed is only 5 pages long and does largely consist of memories of the mother. Respondent requests a reduction of $924.60. I find it reasonable to reduce the billing by $500.00.

### iii.  Objection to Hours Expended by Attorneys Not Primarily Working on the Case

Respondent objects to the time spent on this file by attorneys other than Ms. Chin-Caplan and Ms. Ciampolillo. As set forth in the respondent's objections, over the course of the 8 year history of this case Mr. Conway billed 18.7 hours, Mr. Homer billed 11 hours, Ms. Fashano 5 hours, Mr. Pepper .1 hours, and Ms. Daniels 7.5 hours. Resp. Response at 25. Respondent argues that no private client would agree to pay for the time of attorneys who had "no substantive involvement in, or knowledge of the case." Id.  A review of the billing records indicates that Mr. Conway was involved in the case at the outset and appeared to be in charge of the firm's initial intake and evaluation of the case. See generally Pet. Motion Tab A. He billed 9.5 hours prior to 2014 with an additional 9.2 hours to prepare the fee petition, to which the respondent does not object. Resp. Response at 25, 40; see Pet. Motion Tab A. After the initial period, Mr. Conway's involvement seems to have been primarily editing motions or correspondence with experts.

Respondent requests that I use my discretion to reduce all of the time billed by Ronald Homer, a total of 11 hours over the life of this case. Resp. Response at 24. Both Mr. Conway and Mr. Homer are among the most experienced attorneys in the Vaccine Program.  Mr. Homer is the attorney of record on all cases at the firm.  This is done so that he performs a supervisory function, assuring that all orders are complied with, deadlines met and assignments among the firm's attorneys made.  Most of his time entries are in very short increments of time such as .1 or .2 hours at a time. See generally Pet. Motion Tab A. Given that the firm has been counsel of record in approximately 350 cases since 2007, the need to perform this function and to otherwise provide a quality control function to the work output of the firm is commendable. As attorney of record, Mr. Homer is responsible for assuring that all deadlines are met and that the work on behalf of the firm's clients proceed as it should.  The fact that he usually delegates more individually time consuming projects such as petition preparation, research, brief writing, work with experts, and trial work to attorneys with lower billing rates amounts to a savings to the Program.  At least in this case, the same is true for Mr. Conway. I will not disallow the modest billings made to this file to perform their functions for this case.

Amy Fashano appeared to be more involved in the case at the beginning before Christine Ciampolillo became primarily involved. Meredith Daniels did various research projects, cite checking, and editing of briefs. All of these were reasonable functions and did not involve duplication of work done by others, and from what I can tell from the billing records did not involve any significant amount of time in becoming familiar with an unfamiliar case. I find that the modest billings for Ms. Fashano and Ms. Daniels are also reasonable.

### iv. Objection to Having Two Attorneys Work on the Case as Duplicative

If the billings had not been minimal and did not involve tasks such as oversight, management, cite checking, proof reading, and research by the other members of the firm, there might have been some basis for the objection of duplicative work by attorneys other than trial counsel. However, in my experience, most firms handling complicated cases for plaintiffs assign at least two attorneys to a file. As has been recited above, the scientific and medical foundation of this case was quite complicated and involved relatively new theories as to multiple issues in the case. Ms. Chin-Caplan did the direct and re-direct examinations of Dr. Steinman and Ms. Ciampolillo did the same with Dr. Blitshteyn. Ms. Chin-Caplan cross-examined Dr. Venkatesan.[38] Both were involved in the preparation of the pre- and post-trial briefing of this case. There can be no question that both played substantive roles in the case.

Once again the respondent's objections to the time spent appear to be largely mechanical and do not reflect the reality of the work involved in carrying the burden of proof in a complicated medical case such as this one.  Respondent suggests that the two primary attorneys should not have interacted as to each other's witnesses, that they should have taken less than 16.9 hours of time to review and highlight for the court 34 medical articles on autoimmunity, molecular biology of the

---

[38] Respondent also filed an expert report from Dr. Sladky but ultimately decided not to present his testimony, most likely for reasons unrelated to the case. Nevertheless, petitioner's response to his report had to be prepared.

brain, epilepsy, limbic encephalopathy, febrile infection related epilepsy syndrome, molecular mimicry, the role of the aquaporin-4 water channels in the brain, and their postulated role in the genesis of epilepsy. Resp. Response at 26-39. Respondent objects to both attorneys reviewing the expert reports from both sides and essentially suggests that it would be appropriate for each attorney to be satisfied to understand half the case. Id. If it is not facially clear that both attorneys have to be intimately familiar with all of the expert reports, and of the close interrelationship of the subjects covered, the fact that the issues presented by all of the experts overlapped, and cross examination of both did as well, should make it clear.   It is appropriate for both lead attorneys to know and to interact in all issues of the case.

Respondent suggests that 100 hours between the two attorneys was too much for trial preparation and suggests that I reduce the trial preparation time to 25 hours per attorney or the equivalent of three work days each. Resp. Response at 39. I find it difficult to place these kinds of arbitrary limits on the competent preparation for trial as the Court of Federal Claims has rejected the notion that petitioner's attorneys should put forth less than their best effort on behalf of petitioner, or that they should not prepare for all potentially contested issues. See Holton, 24 Cl. Ct. at 398. It is easy to say, as respondent does, that no client would pay for two attorneys to work on a case, but the reality is that clients in private practice or in the Vaccine Program want their attorneys to do what is necessary to effectively present and win their cases.   In these cases, which require the presentation and cross-examination on complex medical and scientific concepts, the time spent to review and digest hundreds of pages of medical articles and records that are being submitted as evidence to the court in support of the expert testimony by both sides is time consuming.   The need for trial counsel to have reasonable command of the medical and scientific evidence presented in the case is paramount if the petitioner is to be competently represented. The thorough preparation of expert witnesses is as well. I find the amount of time spent in preparation for trial on the issues actually litigated in this case to be reasonable and accordingly am allowing the time billed for trial preparation.

### v.  Travel Expenses

Some of petitioner's counsel's travel expenses for the hearing appear to have been billed at their full rate.   Petitioner's counsel have indicated that they worked on the way to the hearing. It is reasonable that counsel can work while waiting at the airport and on the flight, but unlikely that they would be able to do much work during the remainder of the transfer. Therefore, I will allow three hours at full rate for each counsel on the pre-hearing flights, and the balance of the travel time on the way and in return to be billed at half rate. Thus, Ms. Chin-Caplan's travel invoice is reduced by $2,075.00 and Ms. Ciampolillo's by $570.00 as she had billed the return travel at half rate originally. This calculation is based upon the rates determined to be reasonable above.

### vi.  Objection to Administrative and Secretarial Tasks Performed by Paralegals

Respondent objects to paralegals billing for what she characterizes as administrative or secretarial tasks.  The objection goes to a category of billing called "prepping" of records billed for a total of $2,220.50. Further objection is raised to burning CDs or copying records sent to experts, creating copies of records for binders or electronic copies of documents for hearing, and

booking travel. Respondent states that these tasks were billed at $2,945.10 and should be entirely deducted from any fee award. Resp. Response at 23.

CHC provides four pages of explanation in its reply. See Pet. Reply at 23-27. In essence, CHC indicates that the paralegals who are familiar with the case review incoming medical records, confirm that they are complete, assure that all filings with the court are correct, and completely oversee the production of files to be sent to the experts. Id. The paralegals make sure that the records are legible, complete, in order, and belong to the client in whose case they are being filed. Id. at 23.   The paralegal places exhibits in chronological order, scans and paginates the exhibits. Id. at 24. The paralegal also assures that the exhibits are properly prepared for electronic filing with the court and that they are compliant with the maximum filing requirements. Id. In this case, the primary hospital records were filed in 9 separate volumes so as to comply with those requirements. Respondent objects to the paralegal involvement in preparing the trial notebooks for the hearings and suggests that this is mostly a matter of standing at a photocopy machine. Resp. Response at 22-23. CHC attributes considerably more judgment and organizational skill to these tasks. CHC responds that the paralegals are involved in arranging travel for the attorneys and experts because of the need to interact with the experts, the need to find hotels near the courthouse, and the need to assure that there is conference room space when necessary. Pet. Reply at 25-26.

It is interesting that respondent objects to attorneys not primarily working on the file being assigned tasks, such as research or proof reading, because (as explained above) she suggests that this involves needlessly having another person familiarize himself with the case. Yet, in the paralegal category, respondent seems to argue that secretaries should be able to do many tasks that are closely involved with the organized preparation of a large file, and that somehow it makes more sense for the paralegal to spend the time explaining tasks to a secretary rather than just completing the work him or herself. There seems to be little consideration of how much instruction time is involved in that hand off and how much quality control oversight has to be done to assure that all of the documents are properly prepared, managed, and filed.

Nonetheless, as some special masters have disallowed billing for photocopying and similar tasks, I will deduct $1,000.00 from the billing for paralegal time which reflects some consideration of time spent photocopying and other administrative tasks but allows for all the time involved in organizational oversight and quality control functions that a paralegal performs.

### vii.   Fees for Preparation of Fee Application and Responses to Respondent's Objections

Petitioner has filed a supplemental request for $16,752.00 for attorneys' fees necessitated by the preparation of answers to the respondent's objections to the firm's fee application. See generally Pet. Supp. Motion. Based upon the array of issues raised by the respondent, including the extent of fees earned by CHC since 2007, the cases to which those were attributable, the local rate versus forum rate issues, an appropriate forum rate, and objections to specific uses of time, CHC filed three briefs in support of its fees and in opposition to the respondent's objections. The research and preparation of these documents, including review of all fees and costs received by the firm since 2007, required significant input and time from Mr. Conway and Mr. Homer. The supplemental fee application is granted as modified to reflect the rates that I have determined

above.

## III.   CONCLUSION

At page 103 of its billing statement, CHC provides a summary of each timekeeper's billing at the varying rates for the different years in which the work on this case was done. See Pet. Motion Tab A at 103.  The summary for each attorney and for the paralegals and law clerks is shown at the *Carr* rates for all lines except one which is shown at the CHC proposed rates.  While it appears that the respondent is objecting to the *Carr* rates as well in her sur-reply to petitioner's motion for interim fees and costs, I have concluded that the objection was completely without merit and the *Carr* rates to which both parties had agreed were in effect for prior years. As I have concluded that the appropriate rates differ from the proposed rates for 2014 and 2015, I will show the calculations below.

Interim Fees Request

| Timekeeper | CHC Rates x hours = | Adjudicated rate x hours = | Difference |
|---|---|---|---|
| Conway | $425 x 9.2 = $3,910.00 | $415 x 9.2 = $3,818.00 | $92.00 |
| Homer | $415 x 3.3 = $1,369.50 | $400 x 3.3 = $1,320.00 | $49.50 |
| Chin-Caplan | $415 x 68.3 = $28,344.50 | $400 x68.3 =$27,320.00 | $1,024.50 |
| Ciampolillo | $310 x 115.5 = $35,805.00 | $300 x 115.5 = $34,650.00 | $1,155.00 |
| Schwader | no billings at proposed rate | | ---- |
| Pepper | $295 x 0.1 = $29.50 | $290 x 0.1 = $29.00 | $0.50 |
| Daniels | $285 x 2.8 = $798.00 | $280 x 2.8 = $784.00 | $14.00 |
| Caplan [39] | $200 x 13.8 = $2,760.00 | $145 x 13.8 = $2,001.00 | $759.00 |
| Law Clerks | $160 x 1.6 = $256.00 | $145 x 1.6 = $232.00 | $24.00 |
| Paralegals | $135 x 13.4 = $1,809.00 | $135 x 13.4 = $1,809.00 | $0.00 |

**Total reduction to bill based on adjudicated rates**                     **$3,118.50**

Supplemental Fees Request

| Timekeeper | CHC Rates x hours= | Adjudicated rate x hours= | Difference |
|---|---|---|---|
| Conway | $425 x 10.2 = $4,335.00 | $415 x10.2 =$4,233.00 | $102.00 |
| Homer | $415 x 22.1 = $9,171.50 | $400 x22.1 =$8,840.00 | $331.50 |
| Ciampolillo | $310 x 2.4 = $744.00 | $300 x 2.4 = $720.00 | $24.00 |
| Pepper | $295 x 6.7 =   $1,976.50 | $290 x 6.7 =$1,943.00 | $33.50 |
| Daniels | $285 x 0.2 = $57.00 | $280 x 0.2 = $56.00 | $1.00 |
| Law Clerks | $160 x 0.9 = $144.00 | $145 x 0.9 = $130.50 | $13.50 |
| Paralegals | $135 x 2.4 =   $324.00 | $135 x 2.4 = $324.00 | $0.00 |

**Total reduction from supplemental fee request**                     **$505.50**

---

[39] In reviewing Ms. Nicole Caplan's resume attached as Tab A to petitioner's reply, it appears Ms. Caplan worked at CHC as a law clerk until May 2013. She was admitted to the Massachusetts Bar in November 2013.

**Total reduction of combined fees requests based on adjudicated rates**          $3,624.00

In addition I have deducted a total of $4,145 as set forth above.                                **$4,145.00**

**Total deduction from requested fees**                                                                      **$7,769.00**

**Total fees requested including supplemental  $173,095.60          <u>Total fee award   $165,326.60</u>**

**Total costs billed  $75,860.52                                              <u>Total Cost award   $74,183.52</u>**

**Reimbursement to Mrs. McCulloch                                                            <u>$250.00</u>**

     The above amounts reflect the total amount of interim attorneys' fees, costs and reimbursements approved in this case.  **Accordingly, an award shall be made as follows:**

1) **In the form of a check jointly payable to petitioner and to petitioner's attorneys at Conway, Homer & Chin-Caplan P.C., in the amount of $239,510.12 ($165,326.60 for fees, $74,183.52 for costs); and**

2) **In the form of a check payable to petitioner, Rachel McCulloch, in the amount of $250.00 as reimbursement of her costs.**

     In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accord with this decision.

     **IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master
