# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: December 19, 2017

* * * * * * * * * * * * * * * * * *
|  |  |
|---|---|
| RACHAEL MCCULLOCH, as parent and legal guardian of A.M., | PUBLISHED |
| Petitioner, | No. 09-293V |
| v. | Special Master Gowen |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Attorneys' Fees and Costs for Maintaining Guardianship; Future Costs; Guardianship Plan; Accounting of Estate; Annuity Payments. |
| Respondent. |  |

* * * * * * * * * * * * * * * * * *

Ronald C. Homer, Conway Homer, Boston, MA, for petitioner.
Debra A. Filteau Begley, United States Department of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On May 11, 2009, Rachael McCulloch ("petitioner"), on behalf of her then-minor daughter A.M., filed a petition for compensation under the National Vaccine Injury Compensation Program.[2] Petitioner alleged that A.M. developed a severe neurological injury as a result of receiving a human papillomavirus vaccine ("HPV") on August 16, 2007. Following a favorable ruling on entitlement and a proffer awarding damages, on June 2, 2017, petitioner filed a motion for final attorneys' fees and costs, including those costs associated with establishing and maintaining guardianship over A.M. Respondent generally recommends that I exercise my discretion. He does not object to the costs of establishing the guardianship. However, he objects to the costs of maintaining the guardianship, based in part on his respectful disagreement with

---

[1] Pursuant to the E-Government Act of 2002, see 44 U.S.C. § 3501 note (2012), **because this decision contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." Id. **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.** Id.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (Vaccine Act or the Act). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

my decision in Tadio v. Sec'y of Health & Human Servs., No. 12-829V, 2015 WL 9464870 (Fed. Cl. Spec. Mstr. Nov. 25, 2015).

After careful consideration, I hereby award reasonable attorneys' fees and costs, including the majority of the contested costs of maintaining the guardianship. The contested costs are incurred on a proceeding on the petition under the meaning of Section 15(e) based on my review of Tadio, other relevant case law, and the underlying facts and the terms of the proffer in this particular case. Thus, these costs should be awarded. At his discretion, respondent may fund the approved costs of maintaining the guardianship either through a lump sum or an annuity.

## I.     Procedural and Factual History

Petitioner filed her claim on May 11, 2009. Petitioner alleged that A.M. developed a severe neurological injury as a result of receiving a human papillomavirus vaccine ("HPV") on August 16, 2007. A.M., a minor at the time of filing, reached the age of majority in October 2012. On December 17, 2012, the Circuit Court for Lee County, Florida found that A.M. was permanently incapacitated and appointed petitioner as the guardian of A.M.'s person and her property. See Exhibit 36 – Letters of Guardianship.

On May 22, 2015, I ruled that petitioner was entitled to compensation. McCulloch v. Sec'y of Health & Human Servs., No. 09-293V, 2015 WL 3640610 (Fed. Cl. Spec. Mstr. May 22, 2015). On September 1, 2015, I awarded fees and costs incurred up to June 8, 2015, associated with the entitlement phase and the litigation of the interim fee request. McCulloch, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), motion for reconsideration denied, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The parties then worked together to informally resolve damages. On November 28, 2016, respondent filed a proffer, which I approved on the same day. Judgment was entered on December 7, 2016, and petitioner filed an election to accept the judgment on December 8, 2016. The proffer awarded a lump sum payment of $1,055,056.01 to petitioner as A.M.'s guardian. Proffer at 3.

The proffer also awards an annuity to cover A.M.'s ongoing life care expenses, which both parties' life care planners have estimated to cost more than $120,000 per year with upward adjustments for inflation in future years. Proffer at 1; Proffer - Tab A at 4. The annuity will be paid "directly to petitioner as guardian of the estate of A.M." Proffer at 4-5. If petitioner is removed from that role, the annuity will instead be paid to another party or parties appointed as the guardian, upon written documentation of such appointment to respondent. Id. at 5. Respondent has the sole discretion to pay the annuity on a monthly, quarterly, annual, or other basis. Id. Each payment will be made "only so long as A.M. is alive" at the time it is due. Id. Petitioner is required to provide respondent written notice within 20 days of A.M.'s death. Id.

On June 2, 2017, petitioner filed a motion for final attorneys' fees and costs. Petitioner's Motion. The motion is accompanied by detailed time sheets and invoices. Petitioner requests final attorneys' fees of $49,269.30 and final attorneys' costs of $20,594.44, for a total final attorneys' fees and costs request of $69,863.74. Id.; see also Supplemental Motion filed August 14, 2017.

Petitioner requests reimbursement for certain costs she has personally incurred. Petitioner's Motion at 1, 69-96[3]; see also Petitioner's Statement Regarding General Order #9 filed June 2, 2017.  First, she requests $4,495 for past costs related to establishing guardianship over A.M.; preparing three annual accountings of A.M.'s estate; depositing funds from the proffer; and paying the initial premium on a court-ordered bond.  Petitioner's Motion at 69, 71-96.

Petitioner also requests reimbursement for the costs of maintaining guardianship over A.M. for the remainder of A.M.'s life. There is no dispute that A.M., who has now reached the age of majority, is totally and permanently disabled and is incapable of managing her own affairs.  Florida law offers A.M. protection by requiring an appropriate state court to establish and supervise a guardianship over A.M.'s person and her estate.  Likewise, respondent's proffer made the establishment and maintenance of a duly court-appointed guardianship a precondition of payment.  Petitioner Rachael McCulloch – A.M.'s mother – has been appointed as guardian of A.M.'s person and her estate.  The proffer recites:

> "Petitioner has been appointed as the guardian of A.M.'s estate.  If petitioner becomes unable or is removed as the guardian of A.M. any such payment shall be made to the party or parties appointed by a court of competent jurisdiction to serve as guardian(s)/conservator(s) of the estate of A.M. upon submission of written documentation of such appointment to the Secretary."

Decision on Proffer, Appendix A, ¶ 3.  Petitioner states and has supplied documentation reflecting that in order to maintain the guardianship, under Florida law and Florida court order, she is required to prepare an annual guardianship plan; prepare and file an annual accounting of the estate; and pay an annual bond premium on an unrestricted account not to exceed $200,000 and established with a portion of the proffer's lump sum payment.  Petitioner has provided documentation that these costs amount to $1,715 per year.  Multiplied by A.M.'s reduced life expectancy of 52.98 years and then reduced to net present value using a 1.5% discount rate, the total requested cost of maintaining guardianship over A.M. is $63,841.32.  Petitioner's Motion at 69-96.

On July 19, 2017, respondent filed a response in which he agrees that the statutory requirements for awarding attorneys' fees and costs are met.  Respondent correctly notes that Section 15(e)(1) governs which attorneys' fees and costs the Vaccine Program may award.  This section only authorizes "reasonable attorneys' fees and other costs, incurred in any proceeding on [the] petition."

Respondent generally recommends that I utilize my discretion on the award of attorneys' fees and costs.  He provides: "As an initial matter, because respondent required petitioner to establish a guardianship as a precondition of payment, respondent does not object to the payment of $4,495.00 for services associated with establishing the guardianship for A.M., administering

---

[3] Petitioner's Motion, Tab C, includes an explanation of petitioner's costs (without numbering the pages), followed by the supporting documentation of petitioner's costs (with numbered pages).  For ease of reference, I will cite to the page number of the total document, shown on the ECF heading at the top of the page (i.e., "page 69 of 96").

the guardianship through the present date, and for costs associated with deposit of the settlement funds."  Response at 5.

Respondent then objects to the requested costs of maintaining the guardianship. Respondent contends that under Section 15(e)(1), these costs have not yet been "incurred" and they "cannot be reasonably construed as proceedings on the petition."  Response at 5-8.

Respondent "respectfully disagrees" with my previous decision in Tadio awarding the costs of maintaining guardianship.  Response at 6-7; 7, n. 8 (discussing Tadio, 2015 WL 9464870 (Fed. Cl. Spec. Mstr. Nov. 25, 2015)).  Respondent argues, in the alternative, that this present case is factually distinguishable from my previous case.  Id.

On August 14, 2017, petitioner filed a reply and a supplemental motion for additional attorneys' fees.  On September 5, 2017, I convened a status conference.  I asked whether this issue could be resolved informally.  I also asked whether the opposed costs could be reduced, perhaps through use of an annuity.  Respondent opposed these suggestions and maintained that the Act does not authorize these costs.  I did not issue an order summarizing the status conference, as the parties maintained their respective positions and I did not set any further deadlines.

On September 11, 2017, petitioner filed a status report, in which she proposed an annuity for either 52 years or 30 years of certain payments.  On September 15, 2017, respondent filed a status report repeating his objections and adding that the proposed fixed-term annuities revealed "the speculative nature of petitioner's request."  Respondent further objects that the proposed fixed term annuity could create a windfall, in the event that A.M. passes away prior to the expiration of the annuity term.  The matter is now ripe for adjudication.

## II.     Reasonable Attorneys' Fees and Costs

### a.  General Legal Standards

Under the Vaccine Act, the special master shall award "reasonable" attorneys' fees and costs for any petition that results in an award of compensation.  § 300aa-15(3)(1).  The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1349 (Fed. Cir. 2008).  Under the lodestar approach, a court determines the number of hours reasonably expended in the case and reasonable hourly rates for the attorney(s) involved.  Id. at 1347-58 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  The court multiplies those numbers and may adjust the sum upwards or downwards based on other specific findings.

Under the Vaccine Act, an attorney's "reasonable" hourly rate is "the prevailing market rate defined as the rate prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  Avera, 515 F.3d at 1347-48 (internal quotations omitted).  In determining an award of attorneys' fees, a court should generally use the forum rate, i.e., the District of Columbia rate, unless the bulk of an attorney's work is performed outside of the forum and there is a "very significant" difference in compensation rates between

the place where the work was performed and the forum.  Id. at 1348-49 (citing Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. United States Envtl. Prot. Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)).  The Federal Circuit has determined that the forum rate is effectively a ceiling.  Rodriguez v. Sec'y of Health & Human Servs., 632 F.3d 1381, 1385-86 (Fed. Cir. 2011).

In this case, I authored an extensive decision setting "reasonable" hourly rates for work performed in 2014 and 2015 by various individuals at the Conway Homer firm.  McCulloch, 2015 WL 5634323.  McCulloch has been endorsed by all special masters and guides all determinations of reasonable hourly rates for all attorneys working on vaccine cases within the forum.  The Office of Special Masters has updated the rates in McCulloch to account for inflation in subsequent years.[4]  Under McCulloch and the fee schedules, the special master first determines how many years the attorney had been practicing law, in the year in which he performed certain work.  Attorneys with a certain amount of experience may receive a rate within a certain range.  Where the attorney falls within that range depends on the attorney's general legal experience; specific experience practicing in the Vaccine Program; the quality of work performed in this and other vaccine cases; and the attorney's reputation in the legal community and the community at large.

A request for attorneys' fees should be supported by contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service.  Savin v. Sec'y of Health & Human Servs., 85 Fed. Cl. 313, 316-18 (Fed. Cl. 2008).  Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary."  Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done."  Id. at 1522. The special master may reduce a request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond.  Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 209 (Fed. Cl. 2009).  A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees.  Broekelschen v. Sec'y of Health & Human Servs., 102 Fed. Cl. 719, 729 (Fed. Cl. 2011).

The "reasonableness" requirement also applies to costs.  Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (1992).  A request for costs incurred by either counsel or the petitioner herself should include supporting documentation, such as invoices from experts and itemized receipts.  Like a request for attorneys' fees, a request for costs may be reduced sua sponte and based on the special master's experience and discretion.

**b.  Application**

As noted above, I have previously awarded fees and costs incurred up to June 8, 2015, associated with the entitlement phase and litigating the interim fee request itself.  McCulloch, 2015 WL 5634323.  Petitioner's current motion addresses fees and costs incurred past that date.

---

[4] See Office of Special Masters – Attorneys' Forum Hourly Rate Fee Schedules, available at http://www.uscfc.uscourts.gov/node/2914 (last accessed December 19, 2017).

### i. Reasonable Attorneys' Fees

Petitioner requests $49,269.30 in attorneys' fees.  Petitioner's Motion at 1, 4-28; Petitioner's Supplemental Motion at 1, 4-5.  She requests the following hourly rates:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| **Kevin Conway** | $415 | N/A | N/A |
| **Ronald Homer** | $400 | $400 | $409 |
| **Christine Ciampolillo** | $300 | $300 | $307 |
| **Joseph Pepper** | $290 | $290 | $297 |
| **Meredith Daniels** | $280 | $280 | N/A |
| **Law Clerks** | $145 | $145 | N/A |
| **Paralegals** | $135 | $135 | $138 |

The requested rates for work performed in 2015 and 2016 follow my decision awarding interim fees and costs.  The requested rates for 2017 are consistent with the Office of Special Masters' fee schedule for that year and have previously been found to be reasonable for the individuals involved.  I also find that the rates are reasonable and should be awarded in this instance.

This motion includes some attorneys' fees for further briefing the motion for interim attorneys' fees and addressing respondent's motion for reconsideration on the same.  The case then moved to the damages phase.  Petitioner's counsel then obtained updated medical records, collaborated with respondent and their respective life care planners on establishing A.M.'s future medical needs, investigated and resolved a state Medicaid lien, and resolved all remaining elements of damages.  Petitioner's counsel successfully cooperated with respondent and resolved damages for this significantly and permanently impaired young adult, with very little intervention by the court.  Petitioner's counsel then expended some time preparing the final attorneys' fees and costs award and addressing respondent's objection to the same.  Based on my experience and review, the hours expended on this case are reasonable and do not need to be adjusted.

### ii. Reasonable Attorneys' Costs

Petitioner requests $20,594.44 in attorneys' costs.  Petitioner's Motion at 1, 28-67.  While litigating the interim fee request, counsel paid for a Real Rate Report (cited by respondent) and a transcript of a telephonic status conference with respondent and the Court on that issue.  During the damages phase, counsel obtained updated medical records; retained a life care planner; traveled with the life care planner to conduct a home visit; and paid A.M.'s treating neurologist to answer the life care planner's questions about A.M.'s future needs.  I find that the requested costs are reasonable, adequately documented, and should be awarded.

### iii. Reasonable Petitioner's Costs for Establishing the Guardianship

Petitioner requests $4,495 in costs paid to date for creating a guardianship over A.M. in anticipation of her eighteenth birthday and for being appointed as said guardian.  Petitioner's

Motion at 69, 71-96.  Petitioner paid a Florida-based probate attorney to establish the guardianship in 2012; prepare annual accountings of A.M.'s estate for the first three years of its existence; and to present the proffer to the Florida court.  Respondent does not object to these costs, which he notes were a precondition of payment.  Respondent's Response at 5.  I find that these costs are necessary in light of A.M.'s documented injuries, the requirements of the proffer, and Florida law (further discussed below).  They are also well-documented and reasonable, thus, they should be awarded.

### III.     Petitioner's Costs for Maintaining Guardianship

As noted above, the primary issue presented is whether the costs requested in association with maintaining petitioner's guardianship over A.M. are "incurred" under the meaning of Section 15(e).

### a.   Statutory Construction of the Vaccine Act, Section 15

Respondent respectfully disagrees with my decision awarding the costs of maintaining a guardianship in Tadio.  He raises a statutory construction argument which he suggests was not addressed in Tadio.  I will address this argument first.

Respondent cites the principle that in interpreting the meaning of statutory text, "the court is required to 'give effect, if possible, to every clause and word of a statute,' and should avoid rendering any of the statutory text meaningless or as mere surplusage."  Response at 6 (citing Sharp v. U.S., 580 F.3d 1234, 1238 (Fed. Cir. 2009) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)).  Respondent argues: "While the Act itself does not expressly define 'incurred,' Congress expressly limited when future compensation can be paid under Section 15."  Id.

Respondent first points to Section 15(a), which provides compensation for: "actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which (1) result from the vaccine-related injury for which the petitioner seeks compensation, (2) have been or will be incurred by or on behalf of the person who suffered such injury, and (3) have been or will be" reasonably necessary for the diagnosis or treatment of such injury.  § 15(a)(1)(A).

In comparison, under Section 15(e), "the special master or court shall also award … reasonable attorneys' fees, and other costs, incurred in any proceeding on such petition." § 15(e).

Respondent argues that in Section 15(a), the words "have been or will be incurred" authorize compensation for both past and future expenses.  Such language does not appear in Section 15(e).  Respondent argues that to conclude that Section 15(e) authorizes past and future attorneys' fees and costs would render the more specific language in Section 15(a) "utterly meaningless, which is not a permissible statutory construction."  Response at 6.

I, of course, accept the cited principles of statutory construction, but I disagree with respondent's interpretation.  Each section has a distinct purpose and contains other language that is relevant.  Section 15(a) is focused on compensating for the damages which have been or will

be incurred by the vaccinee, "resulting from the vaccine-related injury," that are "reasonably necessary" for the injury's diagnosis, treatment, rehabilitation, and care.  This involves projecting uncertain future needs so that a single award of damages can be made.

Expenses for needs such as future diagnosis, treatment, rehabilitation, and care, as well as future lost wages, must be based on "reasonable projections."  These projections are made by experts in various fields, including physicians, life care planners, vocational experts, and economists.  These experts make specific projections about the vaccinee's future need for a specific item, for example, a wheelchair; how long that item will be functional and when it will need to be replaced; and the cost of that item.  Similar projections are made about particular medical appointments, tests, medications, therapy, custodial care, travel to receive such treatment, housing modifications, and many other items which will likely be required for the vaccinee's care.  Significant projections are made about how the condition at issue will impact the vaccinee's future earning capability.  So long as the special master finds the experts' projections to be "reasonable," those projections are compensated.  However, the projected costs may not be precise.  The vaccinee might not need a wheelchair to ambulate safely.  Even if the vaccinee needs a wheelchair, said wheelchair may last longer than projected or is more affordable.  He or she may or may not need MRIs on the schedules projected, or neurology evaluations or medications as predicted. The same uncertainty exists with many other projected costs.  The experts can only predict what expenses will likely be necessary and the special master can only decide, based on those experts' qualifications and reasoning, whether the projections are reasonable.  The necessary uncertainty involved in predicting these damages is accommodated by the language of "will be incurred" in Section 15 (a).

In contrast, Section 15(e) authorizes compensation of "reasonable" attorneys' fees and costs "incurred in any proceeding on the petition."   As reviewed below, the word incurred as been interpreted to mean those expenses for which the petitioner has become liable and are tracked to the date on which the liability attached.  They do not involve expert projections involving uncertain events in the future but rather compensation for costs already paid or for which the petitioner is liable based on requirements of the Program.

Compared to Section 15(a)'s focus on expenses stemming from the vaccine injury, Section 15(e)'s focus is on those expenses necessary for establishing eligibility, entitlement, and compensation from the Program.  Petitioner (or his or her attorney) have either paid the costs before filing the application for attorneys' fees and costs, or has become liable for those costs in order to receive an award from the program.

For example, in this case, the proffer required the creation of a guardianship as a precondition of a lump sum payment.  The proffer also required the maintenance of that guardianship as a precondition to annuity payments over the course of the vaccinee A.M.'s lifetime.  Additionally, as will be discussed below, the costs of the guardianship are not projected, but are fixed by Florida state law and by order of the court which will oversee it throughout A.M.'s lifetime.  These are in contrast with discretionary costs, such as those related to the establishment of a special needs trust or investment advice.  While those expenditures may be prudent and in A.M.'s interest, they are not required to establish eligibility, entitlement, or payment from the Vaccine Program.

I have carefully considered respondent's argument, but do not think the narrow focus on "have been or will be incurred" versus "incurred" is dispositive.  In writing Section 15(e), Congress did not "expressly define 'incurred'" or "expressly limit" which future expenses may be compensated.  Without such guidance, a special master necessarily needs to determine whether and when costs are incurred, and whether by their mandatory nature they can reasonably be considered to be incurred in a proceeding on the petition, under Section 15(e).  I will review the applicable case law as well as this petitioner's specific requests within the context set forth above.

### b.  Relevant Case Law

I recently addressed the relevant case law on future costs "incurred on a petition" under Section 15(e).  See Tadio v. Sec'y of Health & Human Servs., No. 12-829V, 2015 WL 9464870 (Fed. Cl. Spec. Mstr. Nov. 25, 2015), citing Black v. Secretary of Health and Human Services, 33 Fed. Cl. 546 (Fed. Cl. 1995) (aff'd in relevant part, 93 F.3d 781, 786 (Fed. Cir. 1996); Barrett v. Sec'y of Health & Human Servs., No. 9-398V, 2014 WL 2505689 (Fed. Cl. Spec. Mstr. May 13, 2014); Fowler v. Sec'y of Health & Human Servs., No. 3-1974V, 2013 WL 5513880 (Fed. Cl. Spec. Mstr. Sept. 13, 2013).  In the present case, the parties have focused their discussions on the same cases and I have not found any additional relevant cases.

First, in Black, the Court of Federal Claims stated that an expense is incurred "at the moment one becomes legally liable, not at the moment when one pays off the debt, not at the moment when one decides that an expense will become necessary one day in the future."  33 Fed. Cl. at 550 (internal citations omitted).  The court was interpreting the former text of Section 11(c)(1)(D)(i), which required a petition to contain an affidavit and supporting documentation, inter alia, that the petitioner "incurred unreimbursable expenses … in an amount greater than $1000."  As respondent notes, at the time Black required a petitioner to have incurred unreimbursable expenses of $1,000 at the time the petition was filed.  This requirement no longer exists.  On appeal, the petitioners argued that they had "incurred" certain expenses that they faced the "near-certain prospect of ultimately suffering."  Black, 93 F.3d 781, 785.  The Federal Circuit rejected the argument and held that "incurred" "does not refer to anticipated payments or obligations for which liability has not already attached."  Id. at 786.  Rather, "to 'incur' expenses means to pay or become liable for them; the term does not refer to any and all expenses that may ultimately be traceable to a particular event."  Id.

More recently, special masters have cited Black while examining what costs are "incurred" under the meaning of Section 15(e)(1).  They have generally awarded the cost of establishing a guardianship "where the guardianship is established as a condition of the settlement and/ or judgment in the matter."  Barrett, 2014 WL 2505689, at *5 (internal citations omitted).  In Barrett and other cases, it was found that where the parties agree and the court approves compensation to petitioner only as the duly appointed guardian of the vaccinee, the costs directly connected to establishing the guardianship are costs "incurred in any proceeding on such petition" under Section 15(e)(1).

Special masters have also examined whether maintenance following an award of compensation are "incurred."  In <u>Barrett</u>, Special Master Corcoran held that petitioner had not incurred future attorneys' fees for preparing a petition for disbursement of funds from the guardianship approximately six times per year for ten years.  The special master stated that petitioner "not only does not presently owe [these costs], but may never owe, depending on the vagaries of life."  2014 WL 2505689, at *5.  Furthermore, petitioner did not establish that it was necessary to make multiple applications each year to spend the annuity payments.  <u>Id.</u> at *6.  In fact, the controlling state law suggested that annuity payments from the guardianship account could be freely distributed as long as they were intended to pay for the ward's welfare.  <u>Id.</u>

In <u>Fowler</u>, Special Master Millman declined to pay petitioner's attorney for the future preparation of annual guardianship accountings, estimated at 4 hours per accounting for 5 years (when the minor would reach her majority).  The special master stated that "not only has this … cost not been incurred, it may never be incurred."  2013 WL 5513880, at *1.  She also noted that the petitioner was not responsible for preparing the accountings of the minor's account. Petitioner had been appointed as the minor's guardian "for the <u>limited</u> purpose of establishing a trust in which [a local bank] will serve as Trustee."  <u>Id.</u> at *1 (citing Petitioner's Exhibit 51) (emphasis added).

In contrast, in <u>Tadio</u>, I found that the petitioners had incurred the future costs associated with triennial accountings on a conservatorship while the vaccinee was a minor, as well as on a final discharge petition within 60 days of the vaccinee's death or attainment of majority.  2015 WL 9464870, at *3.  I found that the costs were not speculative because they were required by the terms of the trust, the court overseeing the trust, and the controlling state law.  The costs had been "incurred" because once petitioners were appointed as guardians, they became liable for those costs under state law.  <u>Id.</u> at *4-5.  Moreover, the costs were "incurred in a proceeding on [a] petition" because the stipulation required the establishment of a conservatorship before compensation would be awarded.  <u>Id.</u> at *5.  Finally, I reduced the estimated fee request to a definite, flat rate of $2,000 per accounting of the estate.  I found that this flat rate was reasonable for the future work and resolved certain vagaries, such as the estimated number of hours and unpredictable circumstances.  Thus, I distinguished <u>Barrett</u> and <u>Fowler</u>, and I granted the requested future costs.

### c.  Application

In this case, petitioner requests sums certain for the costs of preparing an annual guardianship plan, preparing and filing an annual accounting, and annual bond premiums as required by the Florida court.  Based on the criteria in <u>Tadio</u>, I find that these costs are compensable as petitioner became liable for those costs upon entry of the court order establishing the terms of the required guardianship and appointing petitioner as the guardian.

### i.  Preparation of Annual Guardianship Plan

Petitioner first requests the cost of preparing an annual guardianship plan for A.M. Florida law, which controls this issue, provides that a guardian "shall file" an annual guardianship plan for the ward.  Fla. Stat. Ann. § 744.367 (West 2017).  The law mandates

annual filing and grants a judge discretion only to set filing on a calendar-year, fiscal-year, or other basis. If the plan is not timely filed, the judge may remove the guardian, hold her in contempt, or impose other sanctions. Thus, this cost is not speculative. It is required under Florida law, on an annual basis, as soon as the guardianship is established.

It was also "incurred" once the guardianship was established because at that point, the guardian became legally liable to annually prepare and file the guardianship plan. The guardian is required to perform these services so long as the guardianship exists, which in the case of A.M. who is permanently disabled, is until A.M.'s death. If the guardian does not timely file the plan, she is subject to removal or other consequences. Her removal would jeopardize subsequent payments under the proffer.

As discussed above, special masters have found that a cost that is a precondition to payment is incurred "on the petition." Barrett, 2014 WL 2505689 at *5 (awarding costs of establishing the guardianship); Tadio, 2015 WL 9464870 at *5 (awarding costs of maintaining the guardianship following the payment of two lump sums). This is true in the present case. The proffer does not only condition a lump sum payment on petitioner establishing guardianship, it also includes an annuity for the duration of A.M.'s life, payable only to petitioner or another party who is duly appointed as A.M.'s guardian. Because the proffer requires maintenance of the guardianship, the cost is "incurred on the petition."[5]

Respondent also objects to the prospect of petitioner's counsel[6] preparing the annual guardianship plan. He states that "here, unlike Tadio… there is no requirement that petitioner be represented by an attorney in guardianship proceedings." Response at 7, n.4. Respondent correctly notes that in Tadio, the state court denied petitioners' request to allow withdrawal of counsel in order for petitioners to file annual reports without counsel. Tadio, 2015 WL 9464870 at *4. In the present case, neither the Florida statute nor the supervising court has expressly required the annual guardianship plan to be prepared and filed by an attorney. This issue is closer than it was in Tadio. However, the Florida statute provides that the plan "must specify [A.M.'s] current needs" and "how those needs are proposed to be met in the coming year." § 744.3675. The plan must describe A.M.'s residence; her medical and mental health conditions and treatment; her medical providers; planned services for the coming year; her social condition; and the issue of restoration of her rights. § 744.3675.

I find that it is reasonable to have an attorney prepare the guardianship plan because the guardianship plan has a considerable number of requirements and its filing has an impact on whether the guardianship continues, which is necessary for uninterrupted annuity payments.

---

[5] But see Response at 5-6 (asserting that "any continuing costs associated with guardianship cannot be reasonably construed as proceeding on the petition, nor are they a condition of payment of A.M.'s award"; Id. at 8 (asserting: "The terms of the proffer do not require this ongoing cost"; not specifying among the guardianship plan, the annual accounting, and the bond premiums).

[6] While petitioner has been represented by the Conway Homer firm throughout the course of her Vaccine Program claim, she has retained an attorney admitted to practice in Florida and with experience addressing the oversight of guardianship accounts under Florida law. Petitioner's motion includes a letter from the local attorney, listing the costs necessary to maintain the guardianship over A.M. and the estimated costs. The local attorney indicates that he will prepare the annual guardianship plan discussed in this section.

And as mentioned above, the plan must address the possible restoration of A.M.'s rights, which is a legal question. I also find that the attorney's estimate of preparing the plan for $150 each year is reasonable. Petitioner's Motion at 70. If anything, the estimate is conservative given the likelihood of inflation over the course of A.M.'s projected life expectancy.

### ii.  Preparation of Annual Accounting

Petitioner also requests the cost associated with preparing an annual accounting of A.M.'s estate. This is expressly required by Florida law. § 744.367 (the guardian "shall file" said annual accounting. As with the guardianship plan, if the guardian does not comply with this requirement, she may be removed from her role. Just as I have concluded with respect to the annual guardianship plan, I find that the annual accounting cost is not speculative and it was incurred once the guardianship was established because it was a mandatory annual step for maintaining the guardianship for the rest of A.M.'s life. It was also incurred on the petition because it is necessary to maintain guardianship over A.M., as required for the continued receipt of annuity payments. As such, petitioner as A.M.'s guardian became legally liable for this cost upon her appointment, even if the actual payment is not required until the service is performed. See Black, 33 Fed. Cl. at 550 (an expense is incurred "at the moment one becomes legally liable, not at the moment when one pays off the debt, not at the moment when one decides that an expense will become necessary one day in the future") (emphasis added).

This is distinguishable from Barrett, in which Special Master Corcoran decided that the petitioner had not incurred the future costs of preparing a petition for the release of funds from the guardianship approximately six times per year for ten years. 2014 WL 2505689, at *5. There, Special Master Corcoran noted that there was no proof that such a petition for authority to obtain funds was required each time such an expenditure was desired. Even if such a petition was required, the number of total petitions would be subject to the vagaries of life. Unlike those expenses which may or may not be incurred in the future based on varying circumstances, the expenses requested in this case are fixed and the required filings are established by the order of the court in order to maintain the guardianship. As noted above, the annual accounting and other costs specifically required to maintain the guardianship are also distinguishable from discretionary costs such as establishing a special needs trust or obtaining investment advice. These discretionary costs may be desirable and prudent. However, they are not required to establish or maintain the guardianship under state law. Neither are they required as a precondition of compensation in the Vaccine Program. Thus, they would not be incurred on a proceeding on the petition.

The Florida statute and the supervising court do not address who should prepare the annual accounting. However, the accounting must detail the receipts and disbursements of all assets in A.M.'s estate and a statement of the assets at the end of the accounting period. § 744.3678. As with an attorney preparing the guardianship plan, I find that it is reasonable and necessary for a qualified professional to prepare the accounting for the court. Petition represents that her local attorney's office employs a certified public accountant who will prepare the accounting for $450 per year. Petitioner's Motion at 70. I find that this cost is reasonable and should be awarded.

### iii.  Fees Associated with Annual Accounting

Petitioner also seeks an audit fee due upon the filing of each annual accounting.  The Florida statute provides that the guardian "shall pay [this fee] from the ward's estate."  § 744.3678.  For an estate valued in excess of $500,000, the court "may charge a fee of up to $250."  § 744.3678.  The guardian may request this fee to be waived upon a showing of insufficient funds in the ward's estate.  § 744.3678.  While the statute allows an audit fee "up to $250", the specific court supervising A.M.'s guardianship set the applicable fee at $250.  Petitioner's Motion at 93.[7]

I find that this audit fee, payable to the court for the annual accounting is not speculative because it is required by statute and the Florida court.  The cost was incurred upon petitioner's appointment as A.M.'s guardian and will continue through the life of the guardianship.  The cost was incurred on the petition as explained above: the fee is necessary to maintain the guardianship, which is a prerequisite to receiving ongoing annuity payments.

The Florida statute and the local court's website establish that the current fee for the current size of A.M.'s estate is $250.  However, there is some uncertainty in future years.  The estate will spend out some funds, but will also receive a substantial infusion from the annuity each year.  On the other hand, the fees charged on all estates may increase.  But considering the totality of the circumstances, I find that petitioner has established that the audit fee is incurred on a proceeding on the petition and it is not so difficult to determine that it should be denied.

Petitioner's local attorney states that the court also charges $5 for each electronic filing.  Petitioner's Motion at 70.  The motion does not contain any supporting documentation of this fee and a cursory review did not find any mention of an electronic filing fee within the Florida statute or on the local court's website.  That fee will be denied.

### iv.  Annual Bond Premium

Finally, petitioner seeks reimbursement for an annual bond premium.  Petitioner's Motion at 69-70.  She states that the local court "ordered the guardian post a $200,000 bond" and set the premium on that bond at $860 per year.  Petitioner's Motion at 80; see also Petitioner's Reply at 6-7.  Petitioner filed several orders from the court but did not provide relevant portions of the Florida statute, which I reviewed separately.

The statute provides: "before exercising his or her authority as guardian, every person appointed a guardian of the property of a ward in this state shall file a bond with surety … to be approved by the clerk of the court."  § 744.351.  Additionally, the court approving the guardianship may establish, increase, or reduce a bond "for good cause."  § 744.351.  "Failure to give bond" or any other "failure to comply with another order of the court" may result in the guardian's removal.  § 744.474.

---

[7] Citing Circuit Court for Lee County, Florida – Fee Schedule, available at http://www.leeclerk.org/index.asp?Type=B_LIST&SEC=%7bF2296480-B3CE-4DA5-A47C-79D72EF94A3C%7d#{F216EC30-033C-4F62-BB10-3D3420F0BD89} (last accessed December 19, 2017).

On December 17, 2012, the Circuit Court for Lee County, Florida appointed petitioner as A.M.'s guardian but did not set any bond because A.M. did not have any assets at that time. Exhibit 36.[8]  After the United State Court of Federal Claims entered judgment on the proffer, petitioner asked the Florida court "for approval in case [the proffer] was construed to be a settlement" and "to set a bond amount."  Petitioner's Motion at 84.  The Florida court cited to section 744.387, which provides that "the court having jurisdiction of" any action by or on behalf of a ward must approve any settlement thereof to make the settlement effective," and the "order authorizing the settlement may also determine whether an additional bond is required and if so, shall fix the amount of it."  The Florida court found that it was not required to approve the amount of the settlement because "the United States Court of Federal Claims ha[d] jurisdiction and ha[d] entered a judgment approving the settlement."[9]  Id.  The Florida court, however, did assert its jurisdiction to supervise the guardianship and the funds paid to the guardian pursuant to the proffer.  The Florida court then ordered that the majority of the funds should be kept in a restricted account but $200,000 should be kept in an unrestricted account, supported by a bond of the same amount secured by petitioner as A.M.'s guardian.  Id. at 84-86.  Petitioner has provided documentation indicating that the annual premium on the bond is $860.  Id. at 87.

The bond premium is not speculative because the Florida court is authorized by statute to set bond and did so in this case.  Even if the proffer qualifies as a settlement (which neither party contends), the United States Court of Federal Claims had authority to approve it and has done so.  However, the guardianship, which is required for the initial lump sum payment and the ongoing annuity payments, as well as by Florida law, is established under that Florida law.  The Florida court authorized the guardianship and retains ongoing supervisory authority over it.  The Florida court is authorized to set bond at the creation of a guardianship or later "for good cause."  § 744.351.  In this case, the Florida court ordered a bond on the new assets awarded by the proffer.  The bond premium has also been incurred under the meaning of Section 15(e) because petitioner became liable upon notifying the Florida court of the proffer.  The Florida court therefore required a bond on the unrestricted account.

Like the other costs addressed above, the bond premium was incurred on the Vaccine Program petition.  While the proffer did not specifically require the bond premium, they are inextricably linked.  The proffer specifies that the annuity for A.M.'s life care expenses shall be paid only to petitioner or another guardian approved by the Florida court.  The Florida court has ordered the bond.  The bond is a necessary administrative expense of the guardianship under the order of the court and is ordered for the protection of the ward.  Thus, like the other costs, this cost is required by the proffer on the vaccine injury claim and by Florida law, in that both require the establishment and maintenance of a court supervised guardianship.  As such, the legal

---

[8] See also Petitioner's Motion at 83 (the Florida court's report and recommendation regarding the proffer, issued April 4, 2017) (stating that when petitioner was appointed as guardian, A.M.'s "only asset… was a contingent personal injury lawsuit").

[9] Respondent objects to this characterization: "The guardianship documents erroneously state that the amounts paid to petitioner on behalf of A.M. were from a 'settlement.' No funds were paid via a settlement."  Response at 5, n. 2.  However, for purposes of the question at issue here and for the Florida court, this is a distinction without a difference.  The proffer awards payments to petitioner and requires the establishment of a guardianship for receipt of same.

liability to obtain and maintain a bond was incurred at the time of the establishment of the trust and will remain in place for the life of the ward.[10]

I also find that the bond premium is determinable. The Florida court has set bond at $200,000, petitioner has provided documentation of the premium on this bond, and respondent has not presented any evidence that this is unreliable or likely to change in the future. It should be compensated and funded together with the other costs discussed above.

## IV.   Structure of Funding these Future Costs

Petitioner requests that the costs of maintaining the guardianship be compensated for 52.98 years, representing A.M.'s future life expectancy as projected by several major life insurance companies. Petitioner's Motion at 70, 96. Respondent objects to these costs being awarded because A.M.'s life expectancy is unknown. Respondent argues that if A.M. passes away before the estimated date, it would potentially create a windfall for petitioner. Response at 8.

Respondent is correct that this projection may be affected by the "vagaries of life," id. (citing Barrett, 2014 WL 2505689, at *5), to the extent that the length of A.M.'s life is indeterminate. It could potentially create a windfall if A.M. passes away earlier than petitioner has projected if awarded as a lump sum. The underlying proffer in this case addressed this issue by funding future life care costs with an annuity. It awards annuity payments only "so long as A.M. is alive" and requires petitioner to notify respondent in writing within 20 days of A.M.'s death. Proffer at 4-5.

I find that the costs for future maintenance of the guardianship may also be funded with an annuity. Petitioner did respond to my suggestion in part and submitted cost estimates for annuities with fixed terms. While a fixed-term annuity would reduce the total sum awarded, it would not eliminate the risk of a windfall. However, this can be addressed through use of an annuity with a life term, similar to the one used to fund future life care costs. I hereby authorize respondent, at his discretion, to fund these costs with an annuity for the term of A.M.'s life (that does not contain an alternate fixed term).[11] The parties should identify the most cost-efficient manner of funding these costs. Respondent may own the annuity. Funding through a life-only annuity will address respondent's concern about creating a post-mortem windfall for A.M.'s heirs and will likely reduce the expenditure to fund these costs.

## V.   Conclusion

The costs of maintaining guardianship over A.M. during her lifetime are compensable. They were "incurred" when the guardianship was created, petitioner was appointed as the

---

[10] These ongoing costs to maintain the guardianship are required under state law, state court order, and the proffer in order to protect the ward throughout her life.

[11] In the case of a severely injured person, particularly a young person such as A.M., annuity issuing companies frequently "rate" the life expectancy because the annuity tables project a more limited life expectancy than normal. This rating has the potential to reduce the cost of the annuity.

guardian, and she became liable for those future costs.  No cost is speculative.  Several are set by Florida law and/ or the Florida court.  The costs for preparation by the Florida attorney and the accountant have been stated as sums certain and are reasonable.  Each cost was incurred on the Vaccine Act claim because the claim was resolved by a proffer which requires lifetime guardianship of A.M. as a prerequisite to the receipt of the lump sum payment and the lifetime annuity for her care.  The requirement in the proffer is consistent with Florida law requiring guardianship over a ward's person and her estate for the purpose of protecting the ward.  Lastly, there is a solution to respondent's concern that petitioner might receive a windfall in that similar to A.M.'s life care expenses.  Respondent may fund the costs of maintaining the guardianship through an annuity with a life term.  Respondent, at his discretion, shall fund the requested guardianship costs or shall purchase an annuity contract sufficient to fund the guardianship costs on an annual basis.

**I hereby award the following:**

1) **A lump sum in the amount of $69,863.74, representing reimbursement for attorneys' fees and costs, in the form of a check payable jointly to petitioner and her counsel Ronald C. Homer of Conway Homer, P.C.**

2) **A lump sum in the amount of $4,495.00, representing reimbursement for petitioner's costs of establishing the guardianship and administering the guardianship to the date of the motion for attorneys' fees and costs, in the form of a check payable to petitioner.**

3) **At respondent's discretion, either a lump sum or an annuity sufficient to fund the costs of maintaining the guardianship.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment forthwith.[12]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties separately or jointly filing notice renouncing their right to seek review.